# Bloomsburg Land Improvement Company, Appellant, v. Bloomsburg.

*Boroughs—Contract—Lease of pleasure park.*

A borough has no power to enter into a contract to lease from a private owner an enclosed pleasure park within the borough limits, for the purpose of deriving a revenue therefrom by subletting or charging the public for admission; and if, in pursuance of such an agreement, the borough enters into possession of the park no recovery can be had from the borough as for the use and occupation of the same.

Argued April 10, 1906. Appeal, No. 59, Jan. T., 1906, by plaintiff, from judgment of C. P. Columbia Co., Dec. T., 1898, No. 158, for defendant non obstante veredicto in case of Bloomsburg Land Improvement Company v. Bloomsburg Borough. Before MITCHELL, C. J., MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Assumpsit for rent. Before STAPLES, P. J., specially presiding.

At the trial the jury returned a verdict for plaintiff for $2,109, subject to question of law reserved.

On motion for judgment for defendant non obstante veredicto, STAPLES, P. J., filed the following opinion:

The substantial facts in the above case, as involving the questions of law herein decided, and which facts are necessary in order to sustain a verdict irrespective of any conclusions of law, are about as follows:

The town of Bloomsburg was chartered by an Act of Assembly of March 4, 1870, P. L. 343, and by its acts of incorporation, certain sections of the Act of April 3, 1851, P. L. 320, regulating boroughs, were extended to the town of Bloomsburg, among these being section 1, clause 4, which empowered it " to hold, purchase and convey such real and personal estate as the purposes of the borough shall require, not exceeding the amount limited in its charter;" and also section 2, clause 4, which empowered it as follows: " to regulate the roads, streets, lanes, alleys, courts, common sewers, public squares, and common

grounds, foot walks, pavements, gutters, culverts and drains and the heights, grades and widths, slopes and forms thereof; and they shall have all other needful jurisdiction over the same; " and also section 2, clause 17, which empowered it as follows : " to make such other regulations as may be necessary for the health and cleanliness of the borough."

On June 13, 1891, the plaintiff, a private corporation, leased to the defendant town, eight acres of land upon which are numerous oak trees, situated within the limits of the town of Bloomsburg, and known as Oak Grove Park, for the term of one year at $1,000 rental per year, payable semiannually, with the privilege of renewals. The defendant town at that time was incorporated and contained about 5,000 inhabitants and had within its territorial limits between three and four square miles. The said Oak Grove Park was situate within the town limits surrounded by a six feet fence and had on it a dancing pavilion, a fountain, ice-cooler with water pipes inside and ice put on the outside of the pipes so that cold water could be obtained, and a place to keep provisions in ; two kitchens, with cook stove in each, tubs in the kitchen connected with water, large water-closets, toilet rooms, two large swings and two small swings and large tables, benches and seats through the grove and two or three booths erected for the purpose of furnishing refreshments.

It may clearly be inferred from the evidence that at the time the lease was made and discussed that there entered into the consideration of the same the fact that the town as lessee could obtain considerable revenue from the said park by renting it out to picnic parties and also by charging a certain small price for each and every person who entered the same, and that it was in no sense to be considered a park open to the public and free to be used by anyone who desired so to do; and in fact, one of the grounds upon which the plaintiff sought to recover was, that the defendant had had the use of the property and had derived revenue from the same.

It may further be stated as a fact that the said Oak Grove Park was not situated either in the center of the town or near to the same, nor did it enter into any plan of the town as laid out in streets, etc., by the municipal authorities. Upon the contrary, it was removed from the business and thickly popu-

lated portion, and, in no sense, convenient to the pedestrian public.

At the termination of the year for which the said property had been leased by the town authorities, negotiations were had towards a renewal of the lease, which was opposed by a number of the members of the town council, and during which negotiations the borough solicitor produced and read at one of the town council meetings an opinion in which he held that the town council had no right or power to lease said property. Notwithstanding the opposition and the advice so given, the borough council by a vote of four to three authorized the renewal of the lease for one year with the privilege of a number of years, and an option to purchase the property, the annual rent being fixed at $500 per annum. The town remained in actual possession of the said park for a period of three years after the first year, for which first year it paid. At the end of the three years it delivered the key and the possession of the park to the plaintiff company or one of its representatives, the park itself having been considerably damaged during the period it was in the possession or control of the defendant town, swings having been broken and torn down, the water-closets put out of repair and, in short, the property being returned generally dilapidated and damaged to at least the extent of $500, and for which the town has since made no reparation.

The claim of the plaintiff in this case was that it was entitled to have and receive from the said town of Bloomsburg three years' rent at the rate of $500 per annum, and $500 for damage done, with interest from 1898, at which time suit was brought. That further, if it should be decided that the town had no right to enter into such contract, that having entered upon the premises and used the same and received revenue from the same, the plaintiff was entitled to recover from the defendant town on a quantum meruit.

The defendant town resisted both claims upon the ground that it was not liable, because the contract itself was ultra vires and being so, a claim on a quantum meruit could not be sustained.

The plaintiff in support of its claim contended that the town had the power to enter into such contract, relying upon the clauses of the act of April 3, 1851, hereinbefore fully quoted ;

that it had the right to hold such real estate for the purposes of the borough requirements ; that clause 4, sec. 2 of said act, giving it the power to regulate roads, streets, . . . . public squares and common grounds, included a park similar to that involved in this controversy, and that clause 17 of sec. 2, giving it the right to make such other regulations as might be necessary for the health and cleanliness of the town could fairly be argued to include a park as it was needed for the health and cleanliness of the people.

This brings us to the consideration of the question of what are the powers of a municipal corporation such as the defendant, and in this connection we think the opinion of Chief Justice MERCUR, in Whelen's Appeal, 108 Pa. 162, clearly sets them forth ; wherein he says : " A municipal corporation does not possess and cannot exercise any other powers than these, to wit : First, those granted in express words ; Second, those necessarily or fairly implied in, or incident to the powers expressly granted ; Third, those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable. Any fair reasonable doubt as to the existence of power is resolved by the court against its existence in the corporation and therefore denied. It is equally well settled that the agents, officers, or city council of a municipality cannot bind the corporation by any contract not within the scope of its powers. . . . Any rule or practice which permits municipal officers to transcend their powers is clearly contrary to public policy and fraught with such mischievous and injurious effect to the taxpayers of the municipality, that it should receive judicial condemnation."

With the principles as above stated and which we believe to be correct and followed by our courts, we are at loss to understand how the contract as executed can be brought within any of the powers or authorities granted to a borough or the town of Bloomsburg, which had granted to it some of the privileges of a borough.

We are unable to find any such interpretation of the law as included the purchase and holding of parks as within the power or authority to hold, purchase and convey real estate as expressed in sec. 1, article 4, of said act of April 3, 1851, nor do we think that it can be argued that, because of the authority

as expressed in sec. 2, article 4, namely: to regulate the roads, streets, lanes, alleys, courts, common sewers, and public squares, a park, such as the one in controversy, was included in the term "public squares," and therefore the town had the right to enter into the contract, leasing the said Oak Grove Park and occupying and using it as hereinbefore stated.

There is a wide distinction between the general definition and common understanding of "public squares" and a "park" like that involved.

In the case of Rung v. Shoneberger, 2 Watts, 23, a public square is defined and explained as follows: "In this state there are few ancient towns in which squares, such as this, do not form part of the plan. They are generally located at the intersection of the streets; and are intended as sites for the erection of buildings for the use of the public; such as court houses, market houses, schoolhouses and churches; sometimes they are designed for ornaments; and at others they are intended for the promotion of the health of the inhabitants by admitting of air. The squares as well as the streets, and for the same reason, are placed under the superintendence of the local authorities, who have full power to regulate them, so as more effectually to answer the purposes to which they have been dedicated. Public squares, unlike commons, are not intended for the exclusive use of the citizens of the city or borough where they are situated, but are also designed for the comfort and convenience of strangers in the pursuit, either of business or pleasure."

In Commonwealth v. Bowman, 3 Pa. 202, Chief Justice GIBSON, said: "The public square is as much a highway as if it was a street, and neither the county nor the public can block it up, to the prejudice of the public or an individual; nor can either assert a right to it by inclosing it beyond the limits of a reasonable curtilage. It is dedicated to the use of all the citizens as a highway, and all have a right to pass over it without unreasonable let or hindrance; in which respect it differs from the public squares in Philadelphia, which are dedicated to health and recreation, and which are necessarily subject to regulation by the local authorities."

"The common or public square in the city of Allegheny is dedicated to specific public uses; as mentioned in the 4th sec-

tion of the act of 1787, and although not a common public highway, yet the public have rights and interests therein, of which they cannot be deprived:" Commonwealth v. Rush, 14 Pa. 186.

The principles as contained in these decisions are approved of in Commonwealth v. Beaver Borough, 171 Pa. 542; Mahon v. Norton, 175 Pa. 279, and Commonwealth v. Connellsville Borough, 201 Pa. 154.

The ancient idea of a public square carried down through all these years, was that a public square meant simply a widening of the street, or the reservation of a plot of ground at intersections of streets, for the purpose of beautifying the town or providing a breathing space in its center or where the people were most likely to congregate and meet. There can nowhere be found any cases from which it could well be argued and concluded that a park, like or similar to that in the present controversy, was intended to be included under the term of "public square," and more strikingly so does it seem, when the fact is recalled that this Oak Grove Park was inclosed by a six feet fence, had been held and was contemplated to be held not for the general public but for the purpose of having a place in which the public could be entertained by swings, dancing pavilion, access to water, places to cook, etc., provided they paid the town of Bloomsburg for the privilege of the same. Public squares were always held to be for the benefit of the public, not only of the people of the community, but those of surrounding places, travelers and strangers. This arrangement for Oak Park excluded, it may be stated, all those persons who were unwilling to pay for the privilege.

There was no such necessity of the town as required it to lease the said Oak Grove Park. There was no authority to lease it that could be inferred from sec. 2, article 4, wherein it had the authority to regulate, inter alia, public squares ; nor is there anything contained in sec. 2, article 17 wherein it provides that the borough had the right or power " to make such other regulations as may be necessary for the health and cleanliness of the Borough " as would give it power to make a contract to lease the said park, as has been urged; and especially will this more clearly appear when the preceding articles, namely the 15th and 16th, are read; article 17 being in line

with the foregoing two articles and clearly intending to refer to such measures as are for the good sanitary condition of a town or borough. It would be establishing an exceedingly bad precedent to hold a contract like that proven in this case to be proper and within the power of a town to make, upon the ground that in the opinion of the town council the said park was necessary for the health and cleanliness of the town.

The park was not indispensable. There is nothing in any of the acts of assembly which could imply a power to lease the same; nor is there grant of such power in express words. The people of the town of Bloomsburg had no need of such a place for the purpose of good air, nor for recreation, and the town council exceeded its powers when it entered into a contract like that upon which the plaintiff seeks to recover.

If a town or borough could enter into contracts of this nature upon a theory such as that contended for by the plaintiff it could easily and quickly ruin the taxpayers by making extravagant and unreasonable contracts with parties like the present plaintiff. The annual rental of a small tract of land like Oak Grove Park, without any improvements upon it, in a town like that of Bloomsburg, would be reasonably small as compared with the rent named in the contract; and the rent as asked and paid and as afterwards contracted for could only be upon the basis of the improvements and moneys expended by the plaintiff for purposes of entertainment of people, which the town itself would have no right to provide for. If four per cent could be considered a fair return for an investment in real estate, the rental as claimed would represent a total investment, or value for the said real estate and its improvements, of $12,500. Who would contend that the town of Bloomsburg would have been justified in entering into any arrangement of that kind, or of purchasing real estate and making improvements at the far end of the town to cost that amount?

Under the general borough act of April 3, 1851, strictly construed and applied to the interests and welfare as affecting the several boroughs and towns of the commonwealth, the borough authorities are given all the powers that are fairly consistent with the health and well-being of the community and the interests of the taxpayers.

The interest of the taxpayer must always be one of the con-

trolling features in questions of this kind. Municipal authorities are not always as careful about the rights of those whom they represent as they should be, and it devolves upon the courts to carefully guard the welfare and well-being of the community.

As bearing upon the question here involved, attention is called to the fact that previous to 1891 we find no general legislation relative to the right of municipal authorities to purchase or acquire lands for park purposes. March 26, 1867, P. L. 547 there was a special Act relating to the city of Philadelphia, and May 18, 1871, P. L. 910, one relating to the city of Pittsburg. On June 24, 1891, P. L. 394, there was an enactment which authorized and empowered cities to take and hold ground for public park purposes, and on June 26, 1895, P. L. 331, this authority was extended to boroughs, which was after the contract in this case had terminated. Applying the principle of expressio unius est exclusio alterius, it is fair to argue that the expression of those things, the borough or town authorities had the power to regulate, excluded those not mentioned, and the presumption was against the power of the officers of such municipality, like that in this case, of contracting for, or spending money, by leasing a park for the purpose of entertainment or recreation. The legislature certainly took this view of the matter, and the act of June 26, 1895, was intended as an enlargement of contractual capacity.

The other phase of the case is no more tenable.

Counsel for plaintiff has cited a number of authorities to the effect that the contract having been completed, and the defendant having had the benefit and use of the real estate leased to it, plaintiff was still entitled to recover, and the defendant could not avail itself of the defense of ultra vires. The majority of the cases cited relate to private corporations, which are held to a much more liberal construction of the power to contract and more strict performance of contracts than municipal corporations, the courts guarding with more zealous care the rights of the taxpayer than the rights of stockholders. It is true there are some cases wherein a municipal corporation has received some benefit under a contract which has been declared ultra vires, but the party claimant being still entitled to recover on the ground of a quantum meruit; but this case does

not fall within the class mentioned, such as where the issuing of bonds has been declared illegal and upon which there could be no recovery, and still the party claimant being permitted to recover on the ground that the borough was responsible or liable for a debt legally contracted, if within the constitutional limitation. See Borough of Rainsburg v. Fyan, 127 Pa. 74.

The distinction is well stated by counsel for defendant, as follows : " That when the municipality is acting within its corporate powers and there is a mere irregularity in the making of the contract, although no recovery can be had upon the contract, it has been held that recovery might be had, under certain circumstances, for money had and received, etc., provided the acts complained of were not immoral, illegal or against public policy, but where a recovery is sought to be had for something which the borough officers had no right or power to contract for, and which was clearly against public policy to allow them to make, in such case no recovery whatever can be had."

Besides, there is no particular merit in the claim of the plaintiff for the reason that it is fair to conclude that it went into this contract with its eyes open, and with every knowledge of what it might expect to occur relative to the position of the town. There was considerable opposition to the execution of this contract. The town council was almost equally divided ; the borough solicitor filed an opinion that the contract was illegal and beyond the powers of the borough officials. All of these things must have been known to the plaintiff company. Notwithstanding this it decided to take the risk, and if the contract is ultra vires, it has no just right or ground of complaint.

" The inhabitants are the incorporators. The officers are only the public agents of the corporation. Their powers and their duties are prescribed by the charter or by statute. All persons dealing with them are bound to know the extent of their powers. Any rule or practice, which permits municipal officers to transcend their powers, is equally contrary to public policy and fraught with such mischievous and injurious effect to the taxpayers of the municipality that it should receive judicial condemnation : " Appeal of Whelen, 108 Pa. 162.

We have every right to assume that either the plaintiff, or

its officers in a representative capacity, had full knowledge of the controversy leading up to the execution of the contract. They went into it with their eyes open and if it were illegal and against public policy, beyond the powers of the town, they have no right to complain, or ask for a recovery on the ground that the town occupied the property and received revenue from the same.

In this connection attention is called to the case of Pennsylvania Canal Company v. Shirley and Union Townships, 18 W. N. C. 397, where it was held that "The supervisors of a township have no power to bind the township by an agreement entered into by them with a canal company, by which the latter agreed to grant to the citizens of the township the right and privilege to use their towpath as a public road. Such a road, not having been laid out according to the act of assembly, does not become by law a public highway, but remains the property of the canal company and the agreement is ultra vires, as well as against public safety.

"In such case the canal company cannot recover from the township the compensation fixed upon by such agreement for the use of their towpath."

The present case is very similar in its principles to the one just cited. The contract was ultra vires and against public policy, and notwithstanding the use and occupation of Oak Grove Park, as established, there was still no right of recovery in the party plaintiff.

The very principle of the law, as held by the court relative to the power and the authority to execute contracts as hereinbefore stated, could easily be evaded by the municipal authorities by simply using and occupying real estate and thereby compelling the taxpayers to pay for the same irrespective of the actual authority to enter into such contracts by said municipal authorities.

In the present day, in the light of developments relative to the unwarranted use of public property and disposition of its public funds, it is well to refer to the principle that all evasions of the law should be frowned upon and that the representatives of the people should be obliged to work and act strictly within the powers granted, and, as held in the appeal of Whelen, every man dealing with them must be on his guard and see that all

contracts entered into are within the scope and powers as granted by legislative authority.

December 11, 1905, for the reasons above stated the court is of the opinion, the contract as made was ultra vires, that there was no evidence in the case which entitled the plaintiff to recover, and judgment is entered in favor of the defendant non obstante veredicto.

*Error assigned* was the judgment of the court.

*H. M. Hinckley*, with him *N. U. Funk*, for appellant.

*Grant Herring*, for appellee.

PER CURIAM, May 24, 1906:
Judgment affirmed on the opinion of the court below.