State ex rel. Kansas City v. Orear.

---

# THE STATE ex rel. KANSAS· CITY v. ED. T. OREAR, City Comptroller.

In Banc, March 15, 1919.

1. **MANDAMUS: Demurrer and Special Answer: Admissions and Concessions: Facts.** Where respondent's return in mandamus consists of a demurrer and a special answer, and relator thereupon files a motion for judgment on the pleadings, the case stands with all the facts well pleaded in the petition confessed by respondent, and with all the facts well pleaded in the special answer confessed by relator.

2. **CITY INDEBTEDNESS: Two-Thirds of Voters.** The provision of the Constitution declaring that no city shall be allowed to become indebted "without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose" means two-thirds of those voting on that particular proposition, and not two-thirds of the whole number of votes cast at a general election held on the same day. So where 43,405 votes were cast at the general election held in the city, and only 34,902 of them voted either for or against issuing bonds at the bond election held at the same time and place, and 26,988 of them voted to increase the city's indebtedness, "two-thirds of the voters thereof" assented to the increase.

3. **ELECTION: Notice: In German Language: Impossibility.** A statute requiring notice of a city election to be printed for three weeks in at least two daily newspapers, "one of which shall be printed in the German language," means that the notice is to be printed in a German language newspaper only when such a paper is published in the city. If there was no daily German paper, and the notice was printed for three weeks in four English dailies and in one German weekly, thereby ample notice being given, the statute's purpose was met, and the notice was sufficiently published.

4. **MUNICIPAL ICE PLANT: Ultra Vires.** Even though its charter expressly permits, no city or town in this State can lawfully engage in the business of manufacturing and selling ice to its inhabitants; and although two-thirds of the voters, at a special election properly held, vote for the issuance of bonds to be used for the purchase or construction and equipment of a plant "for the manufacture, sale and distribution of ice to the inhabitants of the city," the bonds cannot lawfully be issued, nor will they be valid if issued, because the Constitution says that "taxes may be levied and collected for public purposes only," and the business of making and selling ice is not a public purpose.

5. ————: ————: **Public Purpose.** The term "public purposes" employed in the constitutional provision declaring that "taxes may be levied and collected for public purposes only" has no relation to the public need, or to the extent of the public benefit which may follow, but is a term of classification, and it means that the business in which the municipality or the State may not engage is such a business as is sanctioned by time and the acquiescence of the people as being private and not public. However necessary may be clothing and foods the city or State cannot engage in their manufacture and sale without changing their Constitution.
*Held*, by WOODSON, J., dissenting, that a municipal ice plant, to manufacture and sell ice to the inhabitants of a large city, may be constructed and operated under the city's police powers, in the interest of the public health, since ice in such cities

is of prime importance to preserve meats, milk, butter, eggs and vegetables; and the right of the city to issue bonds to construct and maintain such a plant is not to be determined by that clause of the Constitution which says that "taxes may be levied and collected for public purposes only," but by another clause which says that "the people of this St te have the inherent, sole and exclusive right to regulate the internal government and police thereof."

## Mandamus.

WRIT QUASHED (as to first count of petition).

ALTERNATIVE WRIT MADE PEREMPTORY (as to second count).

*E. M. Harber, M. A. Fyke,* and *A. F. Smith* for petitioner.

(1) Under the provisions of the Constitution a two-thirds vote of the qualified voters of the city was not necessary to carry the bonds, but two-thirds only of the voters thereof voting at the election held for that purpose. State ex inf. v. Kansas City, 233 Mo. 162. The voters voting at said general election were not voting at said bond election unless they saw fit to vote at the election held for that purpose. County of Cass v. Johnson, 95 U. S. 360. (2) A proper construction of the Statute is that before publication is required to be made in a newspaper printed in the German language, there must exist such paper which has been published for fifty-two weeks next before such publication. To be eligible to publish the notice, the German paper must have been published for fifty-two weeks, etc. And unless such paper had been so published, notice therein is not required by the act. Moreover, to give the construction contended for by respondent, would discriminate between cities wherein such German paper was published, and cities wherein no such paper exited. In one class bonds could be voted; in the other, no bonds could be voted because there would be no means of

277 Mo.—20

giving legal notice.  State ex inf. v. Borden, 164 Mo. 221.  The object of publication is to give notice, and if the requirements as to notice are substantially complied with it is sufficient.  John v. Connell, 71 Neb. 10. (3)  The provisions of the Kansas City Charter give the city the undoubted right to issue bonds to acquire or construct a Municipal Ice Plant, and to furnish to the inhabitants of the city ice.  Nothing in this day and age is more necessary to the health, comfort and welfare of the inhabitants of the city than a sufficient supply of ice at reasonable prices.  It is quite fully as necessary as the supply of water in its unfrozen state, or the supply of gas or electricity.  There in no provision of the constitution or statute prohibiting the city from acquiring, constructing and maintaining an Ice Plant.  Water Co. v. City of Aurora, 129 Mo. 575.  Or electric light plants selling current to private persons. State ex rel. v. Allen, 178 Mo. 577.  Innumerable instances might be suggested to show that the health, comfort and welfare of the inhabitants depend as much on an adequate supply of ice as upon any other thing, which may be supplied by the city.  A kindred question has been considered and pass upon by the Supreme Court of Georgia.  Holton v. City of Camilla, 134 Ga. 560; Jones v. City of Portland, 245 U. S. 217; Laughlin et al. v. City of Portland, 111 Me. 486.  A case exactly in point here is Saunders v. Mayor of Arlington, 94 S. E. 1024.

*Charles M. Howell* and *Lathrop, Morrow, Fox & Moore* for respondent.

(1)  Where propositions to increase the bonded indebtedness of Kansas City are submitted under Section 31, Article 18, of the Charter, at a general election, it is necessary that such proposition have the assent of two-thirds of the voters voting at such general election.  Sec. 12, Art. 10, Mo. Const; State ex rel. v. Mayor St. Louis, 73 Mo. 435; State v. Winkelmeier, 35 Mo. 105; State ex

rel. v. Satterfield, 54 Mo. 391; State ex rel. v. White, 162 Mo. 533; State ex rel. v. McGowan, 138 Mo. 187; State ex rel. v. Wilson, 129 Mo. App. 243; State ex inf. v. Kansas City, 233 Mo. 162; School Dist. v. Oellien, 209 Mo. 464; State ex rel. v. Francis, 95 Mo. 51; State ex rel. v. Brassfield, 67 Mo. 331; State ex rel. Cope v. Foraker, 47 Ohio St. 667; State ex rel. v. McClurg, 48 L. R. A. 652; Belknap v. Louisville, 34 L. R. A. (Ky.) 256; People v. Wiant, 48 Ill. 263; Everett v. Smith, 22 Minn. 53; State v. Bechel, 22 Neb. 158; State ex rel. v. Benton, 29 Neb. 460; Bryan v. Stephenson, 35 L. R. A. (Neb.) 752; Stebbins v. Judge, 108 Mich. 693. (2) The extent of the city's power should be determined in the light of the settled judicial view of this court. (a) A municipal corporation has no powers, except those granted by its charter expressly, or by necessary implication. City of St. Louis v. Bell Telephone Company, 96 Mo. 628; City of Independence v. Cleveland, 167 Mo. 388; St. Louis v. Dreisoerner, 243 Mo. 223; City of Joplin v. Leckie, 78 Mo. App. 11; City of St. Louis v. Laughlin, 49 Mo. 563; State ex rel. v. Associated Press, 159 Mo. 467; State v. Scuchmann, 173 Mo. 111; Knapp v. Kansas City, 48 Mo. App. 492; Sedalia Gas Light Company v. Mercer, 48 Mo. App. 644; Houstonia v. Grubbs, 80 Mo. App. 437; Kansas City v. Lorber, 64 Mo. App. 608; White v. Railway Company, 44 Mo. App. 540. (b) An ordinance even if literally authorized by the charter, is void if it is unreasonable in its purpose or effect. Corrigan v. Gage, 68 Mo. 541; Union Cemetery Association v. Kansas City, 252 Mo. 500; American Tobacco Company v. St. Louis, 247 Mo. 374; State ex rel. Kansas City v. Kansas City Terminal Railway Company, 260 Mo. 489. (c) Not even the sovereign Legislature, much less a municipal corporation, can, by *fiat*, make that public which is in fact private. State v. Loomis, 115 Mo. 320; State ex rel. v. Ashbrook, 154 Mo. 375; State ex rel. v. Associated Press, 159 Mo. 410; State v. Public Service Commission, 205 S. W. 37. (3) The charter of Kansas City does not expressly

authorize the municipality to engage in the ice business for itself or for the purpose of manufacturing or distributing ice to the inhabitants of the city; nor would such business or industry constitute a public purpose for which the city charter could constitutionally authorize the city to levy taxes, vote bonds or expend the public moneys. 3 Dillon on Municipal Corporations, sec. 1292, p. 2096; Cooley on Taxation (2 Ed.), Chap. 4, pp. 115-118; Opinion of the Justices, 155 Mass. 598; Opinion of the Justices, 182 Mass. 605; Baker v. Grand Rapids, 142 Mich. 687; Union Ice Co. v. Ruston, 135 La. 898; Los Angeles v. Lewis, 167 Pac. 390.

FARIS, J. — This is an original proceeding by mandamus in two counts, whereby it is sought to compel respondent as City Comptroller of Kansas City to prepare, sign and arrange for the sale of two certain issues of municipal bonds heretofore authorized, as it is alleged, by elections held for those purposes.

The petition filed herein sets forth, as stated above, two separate causes of action in two separate counts. By the first count of the petition it is sought to compel respondent to perform his official duties above named with reference to a certain proposed issue of $400,000, par value, of municipal ice-plant bonds (so-called to distinguish them and for brevity), which bonds it is alleged were duly authorized by an election to be issued and sold and the proceeds thereof used "for the manufacture, sale and distribution of ice to the different municipal departments of the city, and for the manufacture, sale and distribution of ice to the inhabitants of the city."

By the second count of the petition herein it is sought to compel respondent to perform his official duties in the preparation, signing and sale of an issue of $200,000, par value, of fire-protection bonds, which likewise were, it is alleged, duly authorized to be issued by an election and which are to be used in the "purchase and construction of improvements and betterments for

the city's system of detecting, preventing and extinguishing fires.''

Upon the making here by relator of the application for the issuance of our writ of mandamus, the respondent entered his appearance; waived the issuance of our alternative writ, and agreed that the petition filed herein should stand for and be treated in all respects as the alternative writ of mandamus, and that the respondent should plead thereto as if to such alternative writ.

Thereupon, the respondent, for his return to both the first and second counts of the petition herein, demurred generally thereto, for that said counts and each of them failed to state facts sufficient to entitle the relator to the relief prayed for. After demurring generally, respondent further alleged by way of answer and for his further excuse in law for failing to perform his official duty as aforesaid, that the elections held to authorize the issuance of the bonds were invalid, for that (a) two-thirds of the voters voting at the elections therefor did not vote in favor of the issuance thereof, and (b) that the notice of the elections was not published, as the statute requires, for at least three weeks in a daily newspaper published in the City of Kansas City and printed in the German language, and having a bona-fide circulation in Kansas City of at least 2000 copies of each issue and which had been continuously published in said city for at least fifty-two weeks next before such elections.

Upon the first point, the conceded facts show that the elections upon both of the proposals to issue bonds were held at the same time and place as the general election for federal, state and county officers was held, to-wit, on the 5th day of November, 1918, and at the regular polling places; that the total number of votes cast at this election for such federal, state and county officers was 43,405, but that there were cast on the proposals to issue the bonds in question only 34,902 votes, of which number 26,988 voted in favor of issuing said bonds, and 7,914 against the issuance thereof.

State ex rel. Kansas City v. Orear.

Upon the second point of contention, the facts show that the notice of said elections, while not published in a daily newspaper printed in the German language, because none such existed there, was yet published in a weekly newspaper printed in the German language, and likewise published in all of the English daily newspapers which were published in the city of Kansas City.

Both of the above contentions which affect the alleged invalidity of the elections apply of course to both issues of bonds here in controversy. Another contention, however, is made in the return touching the proposed issue of bonds to acquire and operate an ice-plant, which is that the business of manufacturing, selling and distributing ice is not a public purpose, and for that reason the ordinance which provides for the issuance of bonds whereof the proceeds are to be used for that purpose is void.

Upon the filing here of the return of respondent consisting, as stated, of a general demurrer and of the special answer above substantially set out, the relator filed in this court a motion for judgment on the pleadings.

Therefore, the case stands here with all of the facts, which are well pleaded in the petition, confessed by respondent, and with all of the facts set out in the special answer of respondent confessed by relator. The case is here, therefore, and up for decision upon the above facts, and such others as we shall have occasion to set out in our opinion.

Two contentions affecting the validity of the elections at which the issuance of the bonds was attempted to be authorized are made by respondent as excusing in law his refusal to act in the premises. These two contentions as stated affect the fire-protection bond issue, as well as the ice-plant bond issue. The third contention made by respondent affects the validity of the ice-plant bonds only, and is, to-wit, that the purpose for which the proceeds of the ice-plant bonds are to be used is not a public purpose, and therefore there is lacking

both legislative and constitutional authority to use therefor public moneys raised by public taxation.

I.   The first point urged is that two-thirds of all voters of Kansas City "voting at an election to be held for that purpose" (Cons. 1875, sec. 12, art. 10) failed and neglected to vote in favor of the issuance of the bonds. As forecast in our recital of the facts, this contention is bottomed upon the conceded fact that while 43,405 votes were cast at the general election held in Kansas City at the same time and places, only 34,902 of these were voted at all upon the question of the bond issues. (The number of those voting upon the two proposed issues of bonds differs slightly, but the result and the principle are identical in both and so we consider them together). Of these 34,902, so registering their will positively, 26,988 voted in favor of issuing the bonds, and 7914 voted against such issuance. Therefore, while far more than two-thirds of those voting at all on the proposition to issue the bonds voted in favor thereof, yet two-thirds of all persons who voted at the general election held at the same time and places, did not vote to issue the bonds. Was such a vote a sufficient authorization under the provisions of Section 12 of Article X of the Constitution? We are of the opinion that it was.

*Two-Thirds of Voters.*

So much of said Section 12 of the Constitution as affects and rules the point presented for consideration reads thus: "No county, city, town, township, school district or other political corporation or subdivision of the state, shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters thereof *voting at an election to be held for that purpose.*" (Italics ours.)

Obviously, the decision of the question presented involves only a construction of the above quoted language of the Constitution. This language we are re-

quired to construe in its plain, ordinary and usual sense. [Sec. 8057, R. S. 1909.] Such plain, ordinary and usual sense is that meaning which is given to words and language by the recognized and standard dictionaries of the English language. From these we find that the word "voting" (the same being the present participle of the intransitive verb "to vote") means "expressing the will, mind or preference; casting, or giving a vote." (Webster's Dictionary); "casting a vote, as a formal, or an authoritative expression of opinion; exercising the right of suffrage." [Standard Dict; Century Dict.] Turning, as the point does, solely upon the meaning of the words employed in our Constitution, it is manifest that the cases ruled in other jurisdictions are of negligible value, because of the fact that it is almost, if not quite, impossible to find words used in the organic laws of other states which are even substantially like the language of our own Constitution. Upon situations which are analogous, even, there is much contrariety of opinion in the cases from other jurisdictions. There are apparently conflicts in our own decisions. These conflicts KENNISH, J., in the case of State ex inf. v. Kansas City, 233 Mo. 162, undertook to reconcile by classification. Whether he successfully did so, or not, is, however, beside the question. For Division Two of this court, construing this identical language in a case precisely upon all-fours with this, held that the words "Two-thirds of the voters thereof, voting at an election to be held for that purpose," mean two-thirds of those who actually vote for or against the given proposition, whether such two-thirds be two-thirds or not of all the voters taking part in the election otherwise and voting upon other propositions, matters and things presented thereat and up for decision by vote. [Franklin v. School District, 271 Mo. 1. c. 593.] In the latter case at the page cited, Roy, C. said:

"It is claimed that 136 votes for the proposition is not two-thirds of the total of 214 voting at such election. It is exactly two-thirds of those voting on that propo-

sition, and we think is sufficient to authorize the issuing of the bonds. Section 12 of Article 10 of our State Constitution requires the assent, of two-thirds of the voters thereof voting at an election to be held for that purpose. That section, in the respect now under discussion, has never been construed. Similar provisions in the States of Kentucky and Washington have been construed by the courts of those states as meaning that the result is to be determined by the number of votes cast on the particular proposition.

"In Montgomery County Fiscal Court v. Trimble, 104 Ky. 629, a similar provision of the constitution of that state was held to require only two-thirds of the votes of those voting on the proposition. That case overruled three prior cases and has been followed in frequent cases since. [Board of Education v. City of Winchester, 120 Ky. 591; City of Marion v. Haynes, 164 S. W. (Ky.) 79; Fowler v. City of Oakdale, 166 S. W. (Ky.) 195.]

"In Fox v. City of Seattle, 86 Pac. (Wash.) 379, it was said:

"'The Constitution, it will be noted, does not provide for either general or special elections so termed, but provides only for an election to be held for that purpose. The provision in the charter that such proposition shall have then received the assent of three-fiths of the voters voting at such election construed with reference to the constitutional provision, evidently means three-fifths of the voters who are expressing an opinion on the question discussed in the ordinance; and the question discussed in the ordinance was the question of the loan and the issuance of the bonds.'

"The Constitution must be so construed as to give effect to all its terms. If it be construed to mean two-thirds of all votes cast at an election where other matters are voted upon, then the words 'for that purpose' are, in effect, stricken out of the Constitution.''

State ex rel. Kansas City v. Orear.

II.  But it is contended that the notice of the election held to authorize the issuance of the bonds in question was insufficient, in that such notice was not published for at least three weeks in "a daily newspaper printed in the German language." [Laws 1913, p. 534.]  It appears from the conceded facts that there is no daily newspaper printed in the German language and published in Kansas City. There is a weekly paper printed in that language and published in said city, in which latter paper the notice of the election in question was duly published. In other words, the conditions existing utterly precluded compliance with the strict letter of the Act of 1913.  The officers of the city therefore complied with the statute mentioned by approximation, i. e., as nearly as it was humanly possible to comply under the circumstances existing, by causing publication to be made weekly in a weekly newspaper printed in the German language and published in Kansas City. In passing, it may be noted that the statute, or act referred to and here invoked, requires that the daily newspaper printed in the German language in which any such notice is required to be given must have been in existence for at least one whole year next before the publication of such notice therein. But that *weekly, and not daily, insertions of the notice only are required.*  It will be seen therefore that precisely the same notice was given in the German language as is required by statute to be given, that is to say, as many insertions or different publications of the notice were made by printing the notice in the weekly German newspaper as the statute required to be made in a daily German newspaper. And while the act *supra* requires publication to be made in only two daily newspapers, one of which, as stated, to be printed in the German language, the notice of the election here was published in four English daily newspapers and in one German weekly newspaper. There is therefore no question that as a matter of fact ample notice was given.  Does the mere fact of technical non-compliance with the act's provi-

**[margin note]** Notice: In German. Newspaper.

sions, when strict compliance therewith became impossible, render the election void? We do not think so. We are of opinion that the act in question must be held to require publication of the notice in a German daily newspaper only in case there be in fact such a newspaper published in Kansas City, at the time notice of such an election is required to be published. Any other view is unthinkable. For the effect of a contrary view would be to wholly preclude the issuance of municipal bonds by that city for any purpose, till the statute be changed by the Legislature, or until a German daily newspaper shall have been established, issued and published in that city for a whole year. We may well assume that if there be in Kansas City a sufficient number of voters, who can read German but not English, as to make necessary the giving of notice to them in the German language, then there would be published therein a daily German language newspaper to cater to such voters' literary needs. In a case differing somewhat as to the facts, but analogous in the principle announced, and therefore persuasive, it was said:

"One of the sections of the charter act governing cities of the metropolitan class (Sec. 85, chap. 12a, Compiled Statutes, 1893) provides, that the notice of the sitting of the board of equalization shall be given by publication in three daily papers of the city. The record discloses that there are but two daily papers published which are printed in the English language, and one in the German language. The notice in the case at bar, it appears, was published in all three of the papers mentioned, being printed in the German language in the German paper. It is quite true that, ordinarily, a publication of a legal notice in a foreign language, when not expressly authorized by statute, would not be a valid notice. In the instant case, however, we think an exception arises. The requirement of the rule as to publication of notice in the English language is met by the publication in both dailies printed in that language, they being all the daily publications

in the city printed in English. The Legislature hardly contemplated an impossibility, nor that a publication of the notice in English in a German daily paper should be had in order to comply with the statutory requirement. We are not disposed to adopt such a construction. The object of the notice by publication is to give the greatest possible publicity . . . The objection is not regarded as tenable." [John v. Connell, 71 Neb. l. c. 16.]

It is urged by relator that if the Act of 1913, supra, be given the construction contended for by respondent it would of necessity be unconstitutional, for that it is class legislation. Since we find ourselves constrained to disallow respondent's contention, and to place upon the act a construction which obviates the doing of an impossibility, we need not now or here pass upon the question whether the act is invalid constitutionally as class legislation.

III.   Which brings us to a consideration of the question whether a municipal corporation can lawfully issue bonds for the purpose of erecting and operating a factory or plant for the manufacture and sale of artificial ice. Specifically (and in order that the exact question may be squarely presented, we quote), the stated object of the issuance of what we have herein called the "ice-plant bonds" was, to set out the ordinance, this: "for the acquisition by purchase, or otherwise, of a site or sites, within or outside of the corporate limits of the city, and for the purchase, construction, equipment, extension and enlargement of a plant or plants thereon, for the manufacture and distribution of ice to the different municipal departments of the city, *and for the manufacture, sale and distribution of ice to the inhabitants of the city,* at such times and under such conditions as may be expedient or necessary in maintaining the peace, order, good government, health and welfare of the city and the inhabitants thereof." (Italics ours.)

*Bonds for Ice Plant.*

Two contentions are urged by respondent as excusing his refusal to act. These are (a) that there is no authority contained in the Charter of Kansas City to authorize that city to engage in the business of manufacturing and selling ice, and (b) that the engaging in the making and selling of ice is a private, and not a public business, and therefore a business wherein the money of the public raised by public taxation cannot be used. [State ex rel. v. St. Louis, 216 Mo. 1. c. 90.]

That there must be authority in the Charter of Kansas City, either express or clearly implied, permitting that municipality to engage in making and selling ice, before it can legally do so, is settled by the repeated adjudications in this State. [State ex rel. v. Kansas City Terminal Railway Co., 260 Mo. 1. c. 495; St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis v. Telephone Co., 96 Mo. 1. c. 628.] Quoting Judge Dillon's most excellent work on Municipal Corporations (1 Dillon, Mun. Corp. 3rd Ed. sec. 89) it was said in the very early case of St. Louis v. Telephone Co., supra, at page 628, that: "It is a general and undisputed proposition of law that *a municipal corporation possesses and can exercise the following powers and no others*: (1) -Those granted in *express words;* (2) those *necessarily or fairly implied* in or *incident* to the powers expressly granted; (3) those *essential* to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied."

While by reason of the novelty and far-reaching importance of the question presented, we have mentioned as requisite an apt and sufficient charter provision, nevertheless in the view we are constrained to take of this case it makes no difference whether the issuance of the bonds in question is warranted by a specific provision or the general welfare clause of the

Kansas City Charter or not. The question before us cuts deeper than that: If such bonds can not be issued lawfully the charter permitting, we must needs refuse to compel respondent to issue, sign and sell the same. For even if such issuance is warranted by either an express or implied provision of the charter, the further question arises whether such a charter provision when thus construed is not itself bad, for that it contravenes the constitutional and statutory requirement that the Charter of Kansas City shall be in harmony with and subject to the Constitution and laws of the State. [Sec. 16, art. 9, Cons.] Since the last question if found against the contentions of the relator is decisive of the point whether the ice-factory bonds are valid, we need not trouble ourselves or take up time in further discussing the other one.

*May a town or city in this State, its charter permitting, lawfully engage in the business of making and selling ice to the inhabitants of such city?* In approaching a discussion and a solution of the question we must of necessity take that phase of the case made which is strongest against the exercise of the right contended for. So, we eliminate the mere matter of the city's right to make ice for its own departments, offices and hospitals, as likewise the matter of a sale to the inhabitants of the city of merely surplus ice left after the city's departments, offices and hospitals are supplied by a city ice-factory, and thus we come to state baldly as above the proposition presented.

The state of the conceded facts regarded, there is here no compelling necessity for the relator's engaging in the business of ice-making and vending. For the respondent in his return, while confessing that owing to the exigencies of the war there was a shortage of ice in Kansas City during the summer of 1918, yet avers that this shortage was due to causes not now existing and that steps are being taken to increase the output, thus obviating any recurrence of the shortage conditions from which the city suffered in 1918. The

motion for judgment on the pleadings admits the truth of all this. So, the case is shorn of the element of compelling or absolute necessity, even if such element would under our Constitution affect the situation in a way favorable to relator's contentions; touching which, however, we need not and do not rule. But in passing, even granting for argument's sake the right of the city under the general-welfare clause of its charter, to engage in the selling to its inhabitants of any necessity of life during a period of compelling emergency, it would yet seem plain that no such business could be continued with the money of the public after the emergency had passed. Should a vast and valuable plant be built could it be run with public money after the absolute necessity had passed away?

Our Constitution explicitly says: "Taxes may be levied and collected for public purposes only." [Sec. 3, Art. 10, Cons.] We have held that this was the law before the provision was even put into the Constitution. [State ex rel. v. St. Louis, 216 Mo. 47.] It is obvious therefore that in the final analysis the question becomes, Is the making and sale of ice to all inhabitants of a city who desire to buy, a public or a private business? It is public, of course, in the sense that the police power of the city extends to regulating the cleanliness and sanitary methods of making, handling and vending ice. It is not public in the sense that it is such a utility as comes under the supervision of the Public Service Commission. That it is not the latter is persuasive, but, we concede, not conclusive in the view against its public nature.

When a purpose is public and when it is not, is within the purview of law and our own constitutional provision a close and difficult question. Bread, clothing, shoes, water, light, fuel, ice, drugs and medicines and transportation may be enumerated as some of the things now deemed to be absolute necessities for the human race in the latitude of this State. Some of these, e. g., light and water, are regarded as falling

within the category of things which the well-settled rule permits the municipality, on its business side, to furnish and engage in the business of furnishing. Other of the things enumerated, though equally necessary to the health, comfort, life and well-being of the populate, are, by common consent, regarded as wholly without the powers of the municipality to furnish or deal in. The rule to be invoked in determining whether the business in question—when it is proposed by the municipality to engage in the sale of the enumerated necessities of life—is public or private, is whether such business is sanctioned by time and the acquiescence of the people as being public or private. The twilight zone is apparent and to an extent perplexing. Discussing this question, Mr. Justice MILLER, in the case of Citizens Saving & Loan Assn. v. Topeka, 20 Wall. 664, said:

"It is undoubtedly the duty of the Legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for interference cogent. And, in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."

Judge COOLEY, speaking for the Supreme Court of Michigan, in the case of People ex rel. v. Salem, 20 Mich. l. c. 483, said:

"But when we examine the power of taxation with a view to ascertain the purposes for which burdens may be imposed upon the public, we perceive at once that necessity is not the governing consideration, and that in many cases it has little or nothing to do with the question presented. Certain objects must of necessity be provided for under this power, but in regard to innumerable other objects for which the State imposes taxes upon its citizens, the question is always one of mere policy, and if the taxes are imposed, it is not because it is absolutely necessary that those objects should be accomplished, but because, on the whole, it is deemed best by the public authorities that they should be. On the other hand, certain things of absolute necessity to civilized society the State is precluded, either by express constitutional provision or by necessary implication, from providing for at all; and they are left wholly to the fostering care of private enterprise and private liberality. We concede, for instance, that religion is essential, and that without it we should degenerate to barbarism and brutality; yet we prohibit the State from burdening the citizen with its support, and we content ourselves with recognizing and protecting its observance on secular grounds. Certain professions and occupations in life are also essential, but we have no authority to employ the public moneys to induce persons to enter them. The necessity may be pressing, and to supply it may be, in a certain sense, to accomplish a 'public purpose;' but it is not a purpose for which the power of taxation may be employed. The public necessity for an educated and skillful physician in some particular locality may be great and pressing; yet, if the people should be taxed to hire one to locate there, the common voice would exclaim that the public moneys were being devoted to a private purpose. The opening of a new street in a city or village may be of

277 Mo.—21

trifling public importance as compared with the location within it of some new business or manufacture; but, while the right to pay out the public funds for the one would be unquestionable, the other, by common consent, is classified as a private interest, which the public can aid as individuals if they see fit, while they are not permitted to employ the machinery of the government to that end. Indeed, the opening of a new street in the outskirts of a city is generally very much more a matter of private interest than of public concern; so much so that the owner of the land voluntarily throws it open to the public without compensation; yet, even in a case where the public authorities did not regard the street as of sufficient importance to induce their taking the necessary action to secure it, it would not be doubted that the moment they should consent to accept it as a gift, the street would at once become a public object and purpose, upon which the public funds might be expended with no more restraints upon the action of the authorities in that particular than if it were the most prominent and essential thoroughfare of the city.

"By common consent, also, a large portion of the most urgent needs of society are relegated exclusively to the law of demand and supply. It is this in its natural operation, and without the interference of the government, that gives us the proper proportion of tillers of the soil, artisans, manufacturers, merchants, and professional men, and that determines when and where they shall give to society the benefit of their particular services. However great the need in the direction of any particular calling, the interference of the government is not tolerated because, though it might be supplying a public want, it is considered as invading the domain that belongs exclusively to private inclination and enterprise. We perceive, therefore, that the term 'public purpose,' as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the

extent of the public benefit which is to follow. It is, on the other hand, merely a term of classification, to distinguish the object for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private inclination, interest, or liberality.''

Ice has but recently been elevated—granting for arguments sake the promotion—to a place among the necessities of life. Time was but recently when it was considered as a luxury only. But be this as may be, it is yet certainly no greater a necessity to the human race than are food and clothing. If a city should undertake, ˙absent compelling necessity at least, to establish and operate grocery stores and clothing ''emporiums'' no one would hesitate to say that no power exists in the municipality to use public money, or the proceeds of public taxation, for such purposes. Such things may be given away by the city to paupers and to the temporarily unfortunate, but the city cannot enter into the business of selling such articles to all inhabitants of such city who may desire to buy. If the cities, towns and villages of this State deem that their entry into private business in competition with individuals now engaged in such business is a matter of public expediency, then the initial effort to this end must be an amendment to the Constitution; and following such an amendment the passage of an act changing the common law, which even without the aid of the constitutional inhibition forbids the levying and collecting of taxes for any private purpose or business. [State ex rel. v. St. Louis, 216 Mo. 47.] If the situation were one of continuing, or perennial necessity, a city might well have the power under the general-welfare clause of its charter to take such steps as would be requisite to supply the compelling need for any such necessity of life *so long as such condition existed.* But this as stated above is not the question before us.

While a reference to the holdings in other jurisdictions, which we analyze and discuss below, discloses some contrariety of opinion, we are constrained to rule that our own Constitution and our own trend of judicial opinion touching what is a public purpose for which public money may be used, place us among the great majority of jurisdictions holding in similar or analogous cases that the proposed purpose is not a public purpose. [State ex rel. v. Public Service Com., 205 S. W. 36; State ex rel. v. Associated Press, 159 Mo. 410; State ex rel. v. Ashbrook, 154 Mo. 375; State v. Loomis, 115 Mo. 307; Sec. 3, Art. 10, Cons. of Mo.; State ex rel. v. St. Louis, 216 Mo. 47.]

The question whether a city or town can engage in the making and selling of ice as a business has as forecast never before been up for decision in the courts of this State. It was before the Supreme Court of Georgia in the case of Holton v. City of Camilla, 134 Ga. 560, wherein it was ruled that *under an express statute* conferring upon the City of Camilla the power to erect and operate an ice-factory, such city could exercise this power as an incident to the operation of a lighting plant already existing without contravening the constitutional provisions of that State making "protection to person and property the paramount duty of government" (Par. 2, sec. 1, art. 1, Const. of Ga. 1877), or that which forbids that any "person shall be deprived of life, liberty or property except by due process of law." [Par. 3, sec. 1, art. 1, Cons. of Ga. 1877.] No mention is made in the above case by the Georgia Supreme Court of a constitutional provision such as we have in Missouri; which provides that "taxes may be levied and collected for public purposes only" (Cons. of Mo. sec. 3, art. 10); nor even of any rule of law to the above effect, such as we have, even absent our constitutional provision last above quoted. [State ex rel. v. St. Louis, 216 Mo. 47.]

In the case of Saunders v. Mayor of Arlington, 94 S. E. 1022, also decided by the Supreme Court of

Georgia, the power of the Town of Arlington to erect and operate an ice-factory was (*as appears from the limited concurrences of the judges*) grudgingly and doubtingly bottomed on what may be broadly called the "general-welfare clause," or to be more accurate and exact, upon a provision in the charter of the Town of Arlington which permitted that town to issue bonds for the purpose of sewers, schools, electric light and water systems "and for making any other public improvements."

Likewise, the Supreme Judicial Court of Maine, in the case of Laughlin v. City of Portland, 111 Me. 486, held *that pursuant to an act of the Maine Legislature expressly authorizing cities to establish fuel yards* for the sale of fuel at cost to the inhabitants of such city, the City of Portland could establish such a fuel yard, and that present the exigency of necessity, such use of the money is a public use.

But in the case of Union Ice Co. v. Ruston, 135 La. 898, it was held that even an express provision in the charter of a town permitting such town to engage in the business of making and selling ice to the in-habitants thereof, did not and could not save such business from being *ultra vires,* because violative of the Constitution of Louisiana, which provides, sub-stantially as does our own, that the taxing power may be exercised by municipal corporations for pur-poses strictly public in their nature.

In the case of Rippe v. Becker, 56 Minn. 100, the Supreme Court of Minnesota held that the Legislature had no power to authorize even the State itself to maintain an elevator or warehouse for the public storage of grain.

In the case of Keen v. Mayor of Waycross, 101 Ga. 588, it was held that a city or town cannot engage in the plumbing business, or in the business of selling plum-bers' supplies to its citizens, even though such business be ancillary to and deemed necessary for the successful operation of the municipal waterworks system. While

the above case rode off on the point that express legislative authority to engage in the business mentioned was lacking, it is yet, in view of the subsequent holding in the case of Holton v. Camilla, supra, interesting to note that the Supreme Court of Georgia took occasion to say in the Keen case this: "But the position of the city that to bring about this result [that is, to render the city water works system efficient] it was necessary to engage in the plumbing business is utterly untenable, because obviously not well-founded in fact. It might as reasonably be urged that in order to satisfy its patrons it was necessary for the city to embark in the ice business as an incident to its right to supply good drinking water to its citizens." [Keen v. Waycross, 101 Ga. l. c. 591.]

The Legislature of the State of Maine, apparently having under consideration the passage of a law to permit cities to "establish manufactories entirely on their own account and run them by the ordinary town officers," called on the judges of the Supreme Judicial Court of Maine for their opinion touching the legality of the proposed act. The court held that such a statute would be *ultra vires* and therefore invalid. [Opinion of the Judges, 58 Me. 590.]

In the case of State ex rel. v. Lynch, 88 Ohio St. 71, it was held by the Supreme Court of Ohio that an ordinance passed by the City of Toledo appropriating public money for the establishment and operation of a moving picture show was invalid, because it was an unauthorized use of public money.

In the case of Radford v. Clark, 113 Va. 199, it was held by the Supreme Court of Appeals of Virginia that in the absence of statutory authority a municipal corporation of that State had no power to operate a stone quarry, and that such a power did not inherently flow as a necessary concomitant to the city's duty to keep its streets in repair.

The Supreme Court of Kansas, in the case of State v. Kelly, 71 Kan. 811, held that an act permitting the

State ex rel. Kansas City v. Orear.

State to establish and operate an oil refinery was not upon the facts of the case an incident to providing labor for convicts in the penitentiary, as it ostensibly purported to be, and that the establishment and operation of such a plant would therefore constitute an unauthorized invasion by the State into private business, and would therefore be void.   Touching upon the broad policy of the Federal Government and of the State of Kansas in the behalf under consideration, the Supreme Court of Kansas said: "It has been the policy of our Government to exalt the individual rather than the State, and this has contributed more largely to our rapid development than any other single cause. Our constitution was framed and our laws enacted with the idea of protecting, encouraging and developing individual enterprise, and if we now intend to reverse this policy and to enter the State as a competitor against the individual in all lines of trade and commerce, we must amend our constitution and adopt an entirely different system of government."    [State v. Kelly, 71 Kan. l. c. 836.]

    In an opinion furnished to a branch of the Massachusetts Legislature by the Supreme Judicial Court of Massachusetts upon the query whether a proposed act whereby it was sought to authorize cities and towns to buy and sell fuel was valid, it was said: "Cities and towns now have ample power to provide in any reasonable way for paupers, whether it be by furnishing out of door relief or by support in almshouses, and whether their need of relief is permanent or caused by a temporary condition.   It is equally true that the second of these consequences does not justify taxation of those who do not have occasion to buy coal for the benefit of those who do.   The use of the money of taxpayers for such a purpose would not be a public use, but a use for the special pecuniary benefit of those who happen to be affected by the state of the coal market." [Re Municipal Plants, 60 L. R. A. l. c. 594.]

Without lengthening our views by the analysis of, and citations from, other cases in point or apposite, we take leave to append hereto some of these other cases, which are either directly in point or which throw light upon the discussion from the point of view that municipal corporations may not engage in private business, or use public money in business ventures heretofore deemed to be private: *Re* Municipal Fuel Plants, 155 Mass. 601; Leesburg v. Putnam, 103 Ga. 110; Attorney General v. Leicester, 74 J. P. 385; Baker v. Grand Rapids, 142 Mich. 687 (*another fuel case*); Hayward v. Red Cliff, 20 Colo. 33; Bloomsburg Imp. Co. v. Bloomsburg, 215 Pa. 452; Loan Assn. v. Topeka, 20 Wall. 655; State ex rel. v. Thompson, 149 Wis. 488; People ex rel. v. Salem, 20 Mich. 452.

Recurring again to the view taken in Saunders v. Arlington, supra, that a city may engage in the making and sale of ice pursuant to the power conferred by a clause in its charter authorizing such city *to make any other public improvements,* and to that taken in Holton v. Camilla, supra, that the power to engage in such business is referable to the police power, it is enough to say that both of these cases leave out of careful consideration the question of whether such exercise of the powers invoked violates the constitutional and common-law rule which prohibits the use of public money for other than public purposes. Many things are within the purview of the police power of a municipality, which are yet not so coupled with a public interest as that the expenditure of public money therefor or therein would be justified. The fact that a municipality possesses inherently or by statute police powers, does not mean that it may engage in all those avocations or businesses wherein it has such power; it merely means that it has power to regulate the business of others. Following closely in its definition what was said by GANTT, J., in State ex rel. v. St. Louis, 216 Mo. l. c. 90, the Supreme Court of Minnesota in the case of

Rippe v. Becker, 56 Minn. l. c. 112, said this: "As understood in American constitutional law the term [police power] means simply the power of the State to impose those restraints upon private rights which are necessary for the general welfare of all and is but the power to enforce the maxim, *'Sic utere tuo ut alienum non laedas.'* "

Without further discussion, we are of the opinion that the business of making and selling ice by Kansas City to the inhabitants of that city is not, under the situation shown by the conceded facts, so far a public purpose as to warrant the expenditure therein of public money obtained as the proceeds of municipal bonds, the payment of which with the interest thereon must be met by the levy and collection of public taxes.

It follows that our alternative writ was as to the first count of the petition improvidently issued and should be quashed. But that the failure and refusal of respondent to perform his official duties touching the bonds for fire protection, as set forth in the second count of the petition, are without legal warrant or excuse. As to said second count of the petition of relator, therefore, our alternative writ should be made peremptory. Let it be so ordered.

All concur, except *Woodson, J.,* who dissents in a separate opinion.

WOODSON, J. (dissenting.)—I dissent from the majority opinion in so far as it holds that Kansas City has no power or authority, under the Constitution, to construct and operate an ice plant, and sell ice therefrom to the citizens of the city, and that it has no power to issue bonds of the city for the purpose of sale, and with the proceeds thereof to construct and operate such a plant for said purpose.

In dissenting I approach the legal propositions underlying the questions presented for determination from a totally different angle from that which my learned brother views the case, and that is this:

When we pause for a moment and contemplete what a great city is, its tremendous requirements, and the incalculable beneficence ice constantly brings to its teeming masses of humanity, we are enabled at a glance to see and understand the great and far reaching effects the questions under consideration bear upon the well-being and public health of a great municipality.

Such cities are spread over many thousands of acres of land, laid out in lots and blocks, streets and alleys, avenues, parks and public places. In the densely populated portions the streets, avenues, etc., are improved—paved with brick, stone, asphalt or other materials which are great conductors and retainers of heat, and upon these lots and blocks thousands and tens of thousands of buildings are constructed, from one to many stories in heights, composed of wood, stone, brick, iron and steel, all of which are also good conductors and retainers of heat. Most of the buildings contain stoves, thousands have heating plants, and thousands of others have furnaces, steam or electrical plants, all of which generate large volumes of heat, and all of these buildings are occupied as homes, shops, factories, stores, banking, counting houses, etc. During the hot summer months while the interior of these structures are heated up to the various degrees for the purpose for which they are used, and the hot, scorching sun is pouring forth its burning rays upon their exterior—roofs and walls—augmented with the stifling heat, dust and vapors arising from the busy bustling streets and alleys, one can fully appreciate the terrible heat, and the great suffering of man and beast that is necessarily incident thereto, under the most favorable circumstances, and if, in addition, the teeming masses of men, women and children who reside therein should be deprived of ice, cold drinks and refrigeration, famine, pestilence and death would follow in its wake. Ice cools the brow of the feverish and quenches the thirst of the sick and dying; it preserves sweet and fresh the milk for the babies, their staff of life, as well as the milk, butter.

meat, poultry, eggs and vegetables of all kinds. Without ice, milk would sour, butter become rancid, meat and poultry tainted and spoiled, eggs strong, and all kind of vegetables would become stale, insipid and unpalatable, if not decayed, all breeding microbes, bacteria, disease and death. This may not be true in the same degree in the rural district and smaller towns and cities, where the air is pure and circulates unobstructed, and shade is in abundance, the heat not nearly so great or intense, and where all provisions may be had at home, or from near by, fresh and pure; but not so with great cities abounding with hundreds of thousands, yea, millions of people, who subsist from day to day upon the transportation of every morsel of food eaten, and every glass of milk drunk. Yea, more than that, most of the things mentioned must be transported so far, hundreds of miles, yea, many of them thousands of miles, that transportation must be had in the refrigerating cars, and given the right of way on the wings of lightning expresses, otherwise they would spoil before reaching their destination, and after reaching their destination, whether in the hands of the wholesaler, retailer or consumer, they must again be placed in refrigeration, else they become unwholesome, spoiled and dangerous to the public and private health of the city. Moreover, it is common knowledge that in large cities, even a scarcity of ice causes babies to die like flies, to say nothing of hundreds of others who are old, sick and infirm, who must live upon milk, butter, eggs and other perishable provisions.

These things are so well known to every man and woman who live in large cities, it would seem a useless waste of time to press the matter further upon the attention of the court.

I know of no greater calamity that could befall the large cities of this State and country than to deprive them of ice; in one week, I dare say, food stuffs would double and treble, and sickness, disease and death would multiply with leaps and bounds. To all such cities, ice

has become a prime necessity, the equal to any of them and superior to most, for without it some of the others cannot be had, and many of them only in an unhealthy and deplorable condition.

It is no longer a debatable question that ice is strongly conducive to the public health and well-being of our large cities, and to hold that the Constitution prohibits them from preserving the public health and well-being is to face about and deny that which we have been writing upon that subject in this State for almost a century, and flies into the very teeth of Section 2 of Article 2 of the Bill of Rights, which provides that "the people of this State have the inherent, sole and exclusive right to regulate the internal goverment and police thereof." The word "police" as used in this provision of the Constitution means, as defined by Mr. Webster, "The internal organization or regulation of a State, the control and regulation of a community or State through the exercise of the constitutional power of government; especially such control and regulation with respect to matters affecting the general comfort, health, morals, safety or prosperity of the public."

The constitutional provisions cited and relied upon by my learned associate in support of the position taken by him in the majority opinion, have, in my opinion, no application whatever to the facts of this case. I say this, for the reason that if I am correct in the views expressed regarding the important factor ice contributes to the well-being and general health of our large cities, then its production, sale and distribution to their citizens, would not be a private enterprise, but public in the highest degree and sense of that term, and, therefore, the expenditure of the revenues of the city for those purposes would likewise be for public purposes and not for private use or gain.

Moreover, I have always understood, and in my opinion it is no longer a debatable question in this State and country, that all laws enacted for the preservation of the public health and well-being of a city

or State are derived from the police power of the State, and that it is an inherent attribute of sovereignty, and is unabridged by any constitutional provision that can be found in the State or Federal Constitution. This is the express provision of Section 2 of Article 2 of the Bill of Rights before quoted, and the unqualified ruling announced by this court In Banc in the case of City of St. Louis v. Public Service Commission, 207 S. W. 799.

In the light of these constitutional provisions, it cannot be said that the Legislature is prohibited, or in any degree trammeled in its sovereign power, to enact such laws for the promotion of the public good and health of our cities and State, as it may deem best, and if ice and refrigeration are conducive to those ends, which in my opinion they are, then as a matter of course, the laws authorizing Kansas City to issue and sell the bonds in question, for the purposes mentioned, are constitutional and valid, and the respondent should be ordered to issue the same; and in my opinion, a manda- tory writ of mandamus should be issued as prayed.

For these reasons, I dissent from the majority opinion.