(1) Arkansas Railroad Commission v. Castetter.

(2) Cap. F. Bourland Ice Company v. Franklin Utilities Company.

*G. E. Garner,* for appellant.

*Horace Sloan* and *Joe C. Barrett,* for appellee.

*Rowell & Alexander, amici curiae.*

(2)   Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland,* Chancellor; affirmed.

*Robinson, House & Moses, Pryor, Miles & Pryor* and *Harry E. Meek,* for appellant.

*Dan W. Bryan, George F. Youmans* and *Geo. W. Dodd,* for appellee.

*Paul McKennon, amicus curiae.*

*Jno. W. Stayton, amicus curiae.*

BUTLER, J. At the 47th session of the General Assembly of the State of Arkansas, act No. 55 was enacted for the purpose, as stated in the title, of "regulating the sale, delivery and distribution of ice, and vesting the Railroad Commission with jurisdiction over the same." The question to be determined in this case is whether the General Assembly, under the limitations upon the legislative power in the State imposed by the Constitutions of the United States and of Arkansas, can fix by law the price of manufacturing ice and provide regulations for the delivery and distribution of the same; and also whether those engaged in the manufacture and distribution of ice may be limited in number in any given territory.

It is claimed by the appellee that said act contravenes (a) the due process of law and the equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and that it is also invalid because it is in contravention of the Constitution of the State of Arkansas and of §§ 2, 3, 18 and 19 of article 2 of the Constitution of the State of Arkansas, because said act deprives the appellees of the right to engage in lawful business, and is a denial of equality of privileges, and authorizes the creation of a monopoly; and (b) that the provisions of the act authorizing the Railroad Commission to fix the price of ice is in contravention of the due process of law and the equal protection clauses of the Federal Constitution and similar clauses of the State Constitution, in that the ice business is not a business affected with a public interest.

■ There has of late years come into being a school of political science, numbering some of the leading thinkers of this country, which affirms that the aphorism, "competition is the life of trade," is illusory and false, and that the best method of protecting the public in the prices it must pay for commodities is that those commod-

ities be manufactured and distributed by monopolies. It is argued that by this means excessive investments and expenses will be eliminated, and therefore an article may be produced and distributed to the consumer at a far less cost than by an unregulated competition. It has been said that "competition is at once an expensive and absolutely ineffective ultimate method of regulating either the rates or the service of the modern municipal public utility, and that the objection to competition is the economic one of the unnecessary duplication of the investment and expense of maintenance and operation of two parallel systems, where one could render adequate service at practically half the cost of the installation, maintenance, and even of operation." Our Legislature evidently had this idea in mind when it provided, by § 15 of the act under consideration, that the Railroad Commission should not issue certificates to any person, firm or corporation authorizing the manufacture, sale or delivery of ice at any point where the facilities for the manufacture, sale and distribution of ice already existing are sufficient to meet the public needs therein and in § 16 providing the procedure for carrying its provisions into effect; and also when, in § 17 of said act, it provided that in any city, * * * place or community where more than one person * * * is engaged in the manufacture, sale or distribution of ice, and the expenses of such may be decreased, or the business conducted in a satisfactory or economical manner, joint operation of the facilities used for the purposes aforesaid may be authorized, and where it is shown that any one or more of the separate businesses cannot be operated at a profit, or that it would be to the public benefit, then one or more of the parties might acquire the property of the others, or that the parties might consolidate their businesses, "it being the purpose to prevent the duplication of unnecessary plants, facilities and service, and to afford the public prompt and continuous service at just and reasonable prices."

774

This may be a sound economic policy, but we cannot consider the expediency of these provisions, for the question for our determination is not that of policy, but of power. In our opinion, these provisions run counter to the genius and policy of our organic law, because the virtual effect of the provisions in the statute adverted to is the creation of monopolies, which are abhorrent to the principles of common law and which are expressly inhibited by the framers of our Constitution, in the Bill of Rights contained in article 2 of the Constitution of 1874. By § 2 of said article, the right to acquire and possess property is recognized and its protection guaranteed. By § 3 of the article the declaration is made that no citizen shall be deprived of any right, privilege or immunity. By § 18 the General Assembly is prohibited from making any grant to any citizen or class of citizens of privileges or immunities which upon the same terms shall not equally belong to all citizens. Section 19 declares that "perpetuities and monopolies are contrary to the genius of the republic, and shall not be allowed." By § 29 the declaration is made "that everything in this article is excepted out of the general powers of the government, and shall forever remain inviolate, and all laws contrary thereto or to the other provisions herein contained shall be void."

A monopoly is said to be "an exclusive right granted to one person or class of persons of something which was before of common right." 41 C. J. 82. Bouvier's Law Dict. defines monopoly as "a grant by the sovereign power of the State, by commission or otherwise, by which the exclusive right of buying, selling, making, working or using anything is given." In *Seattle* v. *Denker,* 58 Wash. 501, 108 Pac. 1086, it is said: "A monopoly exists when the sale or manufacture is restrained to one or to a certain number." The power to create exclusive privileges by legislative grant has long been recognized, but in all instances where this power is exercised the individual citizen had no inherent or natural right to engage

in the occupation or to use the thing granted. Legislatures have from earliest times granted exclusive ferry, turnpike and wharfage rights, but this was because the thing granted was the exclusive property of the sovereign of which it might have exclusive use, or which it might grant to any designated agency. This is also true of what has now come to be designated as public utilities, such as railroads, municipal lighting and water plants, and the like. The reason for the right to make the exclusive grant was because the one to whom the grant was made could not operate without first permission of the State to exercise some right which was originally and exclusively in the sovereign, or to use the property of that sovereign. But in all of the cases where an exclusive privilege to conduct a business has been granted, the citizen had no right before the grant of the privilege to conduct such business. In other words, the thing granted was not something which was a natural or common right.

Power to grant an exclusive franchise, where it is shown in the particular case to be justified as a measure for the safety or interest of the public, is unquestioned, but it is essential that the thing granted be something that is not of natural or common right. For instance, one person cannot be restricted in his right to use and enjoy his property in a particular manner in order that another may use his property in that manner to a greater profit than he could if each was left free to use his own as he pleased. *Commonwealth* v. *Bush* (Ky.), 26 Am. Rep. 189.

In the case of *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 6 S. Ct. 252, it was held that the right to operate gas works and to illuminate a city could not be exercised without special authority from the sovereign. The court said: "It is a franchise belonging to the State, and in the exercise of its police power the State could carry on the business itself or select one or several agents to do so."

The right of the Legislature to prohibit absolutely the engaging in a given calling cannot be doubted, where

such calling is inherently injurious to the public health, safety or morals, or has a tendency in that direction (*State* v. *Armstrong,* 38 Idaho 493, 225 Pac. 491; 33 A. L. R. 835; *Muggler* v. *Kansas,* 123 U. S. 623, 8 S. Ct. 273); and, having the right to prohibit it, would have the right, of course, to prescribe by whom or how the business might be conducted—to permit some to engage in it and deny it to others. But it cannot be said that the manufacture or sale of ice is either injurious to the public health, safety or morals, but, on the contrary, is a useful and necessary occupation. While the manufacture of ice is a modern industry, it is one in which any one might engage as a matter of common right, and did not originally come within the power of the State to license or regulate. Any person, having the means and inclination to engage in that business, might do so without having to call upon the State to grant it some power or privilege not common to all citizens alike.

This court, in the case of *Ex parte Deeds,* 75 Ark. 542, 87 S. W. 1030, in construing a statute denouncing the penalty against any person, *etc.,* who should travel over or through any county and sell certain specified articles, but excepted resident merchants of the county, held the same to be in conflict with the equal protection clause of the Fourteenth Amendment to the Federal Constitution and with § 18, article 2, of the State Constitution prohibiting the General Assembly from granting to any citizen privileges or immunities which were not upon the same terms common to all. The court quoted with approval from *Connelly* v. *Union Sewer Pipe Company,* 184 U. S. 450, 22 S. Ct. 431, as follows: "In prescribing regulations for the conduct of trade, it (the State) cannot divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. It is one thing to exert the power of taxation so as to meet the expenses of government, and at the same time

indirectly to build up or protect particular interests or industries. It is quite a different thing for the State, under its general police power, to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce. Such a statute is not a legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates."

In *Lewis* v. *State,* 110 Ark. 204, 161 S. W. 154, a statute granting the exclusive privilege to take fish in a navigable stream to certain classes of persons and under certain circumstances and denying the right to others, was held unconstitutional as in contravention to the Bill of Rights of our Constitution. This also is the effect of the holding in *Dreyfus* v. *Boone,* 88 Ark. 353, 114 S. W. 718, but in that particular case it is held that the monopoly sought to be created by the statute was not a private business, but one which the State, under its police power, might regulate and limit in the proper manner. The court there quoted from *In re Lowe,* 54 Kansas 757, as follows: "While monopolies of any ordinary legitimate business are odious, we have seen that monopolies are upheld when deemed necessary in executing a duty incumbent on the city authorities or the Legislature for the preservation of public health. It is sometimes a matter of great nicety and difficulty to determine whether a particular business or calling is in its nature so directly connected with the public welfare that the performance. can only be safely intrusted to some one acting under public authority."

In the case of *Replogle* v. *Little Rock,* 166 Ark. 617, 267 S. W. 353, the court, in construing and holding invalid an ordinance restricting and regulating the occupation of plumbing, speaking. through Mr. Justice Wood,

said: "Under our State and Federal Constitutions all men have the inalienable right to acquire, possess and protect property and to pursue their own happiness, and of these sacred rights no man can be deprived without due process of law. Any statute, or municipal ordinance enacted pursuant thereto, which challenges the right of any person to engage in the legitimate and honest occupation of plumbing, without restraint or regulation, must find its justification in the fact that such a statute or ordinance is necessary to promote the general welfare. No individual can be deprived of the right to pursue his happiness in his own way, and to engage in honest toil in any avocation and in any manner he sees proper, in order to make a living for himself and those who may be dependent upon him, so long as he does not use such right in a manner to injure others. So long as the individual does not transcend this bound, his conduct is not subject to police regulation. Police power can only be exercised to suppress, restrain or regulate the liberty of individual action when such action is injurious to the public welfare. When statutes, and municipal ordinances pursuant thereto, have been enacted purporting to protect the health and welfare of a community, all doubts as to the constitutionality of such legislation must be resolved in its favor. * * * But, when such enactments are challenged as an invasion of the rights and liberties of the individual guaranteed by the fundamental law, then it becomes the duty of the courts to lay these enactments alongside the Constitution and determine whether the exercise of the police power in the suppression or regulation of ordinary occupations, trades or callings is really necessary for the public good."

In the case of *Balesh* v. *Hot Springs*, 173 Ark. 662, 293 S. W. 14, the court considered and held invalid a statute of this State permitting cities of the first class to prohibit the sale of merchandising by auction because in conflict with article 2 of the Bill of Rights of our Constitution. The court there quoted with approval from the

case of *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, 4 S. Ct. 652, as follows: "The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, * * *must therefore be free in this country to all alike upon the same conditions;" and from *Lawton* v. *Steele*, 152 U. S. 133, 14 S. Ct. 490, as follows: "The Legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business, or impose unusual or unnecessary regulations upon lawful occupations."

In the case of *Scougal* v. *State of South Dakota*, 3 S. D. 55, 51 N. W. 858, 15 L. R. A. 477-84, the following declaration is made: "It necessarily follows from the rules above laid down that, if a business is offensive to the community, or injurious to society, and is to be prohibited, it must be prohibited as to all. If it is regulated and controlled, it must be so regulated and controlled as to leave the business or calling free, under such restraints as the Legislature may impose, to be exercised alike by all. The government, under the guise of regulation, cannot prohibit or destroy. It cannot deprive any citizen of his right to pursue a calling, occupation or business not necessarily injurious to the community, who is willing to comply with all reasonable regulations imposed upon it."

Before a statute can be held unconstitutional, it must appear to be in conflict with some constitutional provision, or be opposed to natural right or the fundamental principles of civil liberty. Statutes are presumed to be constitutional and will not be held to be invalid unless expressly or impliedly forbidden. *Dabbs* v. *State*, 39 Ark. 353; *Moore* v. *Alexander*, 85 Ark. 171, 107 S. W. 395. But, as the business of manufacturing and producing ice is a business not inherently dangerous to the public welfare or morals, but is a legitimate business in which all might engage as a common right, such business could not be regulated or prohibited as to some and per-

mitted to others, especially where it is apparent that the right to limit the number engaged in the manufacture and sale of ice at any given point is for the benefit of others engaged in like business, and the benefit to the public would be remote and problematical. It is clear that the §§ 15 and 17 of act No. 55 are violative of the Constitution of this State, and are void.

■ By § 1 of the act under consideration the Legislature has declared "that the use of ice is a public necessity; that the use, manufacture, sale, delivery and distribution thereof within the State of Arkansas has direct relation to the health, comfort, safety and convenience of the public, the same being a prime necessity of life and monopolistic in its nature, and the price, manufacture, sale and delivery and distribution of ice within the State of Arkansas is hereby declared to be a public business impressed with a public trust and subject to public regulation as hereinafter enacted." By § 4 of the said act the Railroad Commission of Arkansas is clothed with the power to make and adopt reasonable and just rates and charges for the price of ice manufactured or sold in the State, and for the delivery and distribution thereof, and may adopt all necessary rates, rules, regulations and charges to govern and regulate the manufacture, sale, delivery and distribution of ice and to prevent unjust discrimination and extortion in such business.

The appellees in this case contend that the Legislature is without power, through any of its agencies, to fix the price of ice or to formulate rules for its delivery and distribution, because it contravenes the due process of law and equal protection clause of the Federal Constitution and similar clauses of the State Constitution, and that the ice business is not a business affected with a public interest. It is admitted that, if the manufacture and sale of ice is a business affected with a public interest, the Legislature had the power to enact laws by which the price of the product and its manufacture and distribution might be regulated. As is said by Mr. Chief Justice

Taft in the case of *Wolff Packing Co.* v. *Industrial Court*, 262 U. S. 522, 43 S. Ct. 630: "Business said to be clothed with a public interest justifying some public regulation may be divided into three classes: (1) Those which are carried on under the authority of a public grant of privileges. * * * (2) Certain occupations, regarded as exceptional, the public interest attaching to which was recognized from earliest times. * * * (3) Businesses which, though not public at their inception, may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them." In order for the statute to be valid fixing the price and regulating the business of the manufacture and sale of ice, it must come within the third class above mentioned by Chief Justice Taft. It is contended by the appellees that such business is not one affected with a public interest, because such business could be only in the rendition of a service and not in the sale of a commodity; that an ice dealer may or may not sell ice as he chooses; that an ice company has no right to exercise the power of eminent domain, and that the ice business in Arkansas does not constitute a monopoly. In the able and exhaustive briefs filed by counsel for the appellees and *amici curiae*, a number of cases are cited and quoted from at length to support the position taken by them. They contend that the declaration by the Legislature that the ice business is a public business impressed with a public trust (affected with a public interest) and subject to public regulations, is not conclusive upon the court.

In *Wolff Company* v. *Industrial Co., supra,* it is said: "The circumstance of its alleged change from the status of a private business and its freedom from the regulation into one in which the public have come to have an interest, are always subject to a judicial inquiry," and, where the classification is obviously unreasonable and arbitrary, courts may disregard it. But, as is said in *Lindsay* v. *Gas*

*Company,* 220 U. S. 61-78, 31 S. Ct. 337: "When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." Appellees assert that the manufacture and preparation of human food, the manufacture of clothing for human wear, and the production of any substance in common use for fuel, have been held to be businesses not affected with a public interest justifying price regulation, and they argue that, if a business dealing in the manufacture and sale of food for human consumption is not a business affected with a public interest and subject to price regulation, the ice business would be a business having certainly no greater interest than the sale of food, and therefore would not be subject to statutory regulation.

A number of cases have been cited to sustain this view, notably that of *Wolff Packing Co.* v. *Industrial Court, supra; Williams* v. *Standard Oil Co.,* 278 U. S. 235, 49 S. Ct. 115; *Fairmont Creamery Co.* v. *State of Minnesota,* 274 U. S. 1, 47 S. Ct. 506; and *Tyson* v. *Banton,* 273 U. S. 418, 47 S. Ct. 426. We have examined with care the case of *Wolff Packing Co.* v. *Industrial Court, supra,* and are unable to appreciate that case as authority for the views advanced by the appellees. This case was brought to test the validity of the Court of Industrial Relations Act of Kansas, chp. 29, special session, Laws of 1920, which declared as affected with a public interest the manufacture and preparation of food for human consumption, the manufacture of clothing for human wear, the production of any substance in common use for fuel, the transportation of the foregoing, public utilities, and common carriers, and vested an industrial court of three judges with power to hear any dispute over wages or other terms of employment in such industries, and to make findings and fix wages and other terms for the future conduct of the industries.

Under the provisions of the above act the Industrial Court heard a dispute between the Wolff Company and its employees respecting wages the latter were receiving, and made an order as to wages, increasing them over the figures to which the company had recently reduced them. That controversy reached the Supreme Court of the United States on appeal, where, in considering it, the court said: "It is very difficult under the cases to lay down a working rule by which readily to determine when a business has become clothed with a public interest. All business is subject to some kind of public regulation; but when the public becomes so peculiarly dependent upon a particular business that one engaging therein subjects himself to a more intimate public regulation is only to be determined by the process of exclusion and inclusion, and to gradual establishment of a line of distinction. We are relieved from considering and deciding definitely whether preparation of food should be put in the third class of *quasi*-public businesses, noted above, because, even so, the valid regulation to which it might be subjected as such could not include what this act attempts." And further: "We are considering the validity of the act as compelling the employer to pay the adjudged wages, and as forbidding the employees to combine against working and receiving them. The penalties of the act are directed against effort of either side to interfere with the settlement by arbitration. Without this joint compulsion, the whole theory and purpose of the act would fail."

It will be seen from the above quotations from the decision that the court did not undertake to consider or decide that the manufacture of public food, clothing, *etc.*, were businesses not affected with a public interest and not subject to a proper regulation by the State.

In *Williams* v. *Standard Oil Co., supra,* the court held that the business of dealing in gasoline, whatever its extent, is not a business affected with a public interest, because gasoline was one of the ordinary commodi-

ties of traffic differing in no essential respect from a great variety of other articles commonly bought and sold by merchants and private dealers in the country, and that there was nothing to justify the conclusion that the sale of gasoline was a monopoly in the State of Tennessee. It is in fact a matter of common knowledge in this State that the business of selling gasoline is highly competitive, and we may reasonably assume that such conditions exist in Tennessee, and were known to the court.

*Tyson* v. *Banton, supra,* was a case involving the validity of an act of the Legislature of New York which sought to regulate the price of theatre tickets. A majority of the court held that the business of selling theatre tickets was not a business necessary in its nature and differed widely in character and degree from a business which was necessary to the comfort and happiness of the public; that it bore no relation to the commerce of the country, but that the public merely derived ease and amusement by reason of its operation; that theatres were mere private enterprises, and that the sales of theatre tickets were interdependent transactions standing, both in form and effect, separate and apart from each other and terminating in their effect with the instances. However, to the conclusion and judgment of the majority four justices dissented, their dissent being voiced in a very able opinion by Justices Holmes and Stone.

In *Fairmont Creamery Co.* v. *Minnesota, supra,* involving the validity of a Minnesota statute prohibiting any person, *etc.,* buying milk or cream from discriminating between different localities by paying a higher price in one than in another, in holding the statute unconstitutional, the court said: "The real question comes to this: May the State, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and beneficial to the public, and not shown now to be accompanied by evil results as ordinary inci-

dents? * * * The statute itself ignores the righteous distinction between guilt and innocence. * * * It is not permissible to enact a law which, in effect, spreads an all-inclusive net for the feet of everybody upon the chance that, while the innocent will surely be entangled in its meshes, some wrongdoers also may be caught.''

"It is very difficult to lay down a working rule by which it may be determined when a business has become 'clothed with a public interest,' '' but it seems fairly certain, from the cases which have passed upon that question, that, where these conditions arise in a given case, then a business may be said to be affected with a public interest, to-wit, when it is such that the public must use its commodities in such manner as to make it of public consequence; where the nature of the service rendered has become indispensable for the convenience and happiness of the people, and where it is fairly probable that excessive charges and arbitrary control of the business may arise.

The leading case perhaps on this subject is that of *Munn* v. *Illinois*, 94 U. S. 113, where the question determined was the right of the State to fix by law the maximum charge for storage of grain in warehouses at Chicago and other places in the State having not less than 100,000 inhabitants. In affirming this right, the Supreme Court of the United States, through its Chief Justice, after stating the case, said: "This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what is without its operative effect. * * * Property becomes clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When therefore one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use;

but, so long as he maintains the use, he must submit to the control.''

After reviewing the growth of the State and of the businesses regulated by the act under consideration, the court continues: ''This indicates very clearly that, during the twenty years in which this peculiar business had been assuming its present 'immense proportions,' something had occurred which led the whole body of the people to suppose that remedies such as are usually employed to prevent abuses by virtual monopolies might not be inappropriate here. For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the State. But, if it could, we must presume it did. Of the propriety of legislative interference within the scope of legislative power, the Legislature is the exclusive judge. Neither is it a matter of any moment that no precedent can be found for a statute precisely like this. It is conceded that the business is one of recent origin, that its growth has been rapid, and that it is already of great importance. And it must also be conceded that it is a business in which the whole public has a direct and positive interest. It presents therefore a case for the application of a long-known and well-established principle in social science, and this statute simply extends the law so as to meet this new development of commercial progress. There is no attempt to compel these owners to grant the public an interest in their property, but to declare their obligations, if they use it in this particular manner. * * * It is insisted, however, that the owner of property is entitled to a reasonable compensation for its use, even though it be clothed with a public interest, and that what is reasonable is a judicial, and not a legislative, question. As has already

been shown, the practice has been otherwise. In countries where the common law prevails, it has been customary from time immemorial for the Legislature to declare what shall be a reasonable compensation under such circumstances, or, perhaps, more properly speaking, to fix a maximum beyond which any charge made would be unreasonable. Undoubtedly, in mere private contracts, relating to matters in which the public has no interest, what is reasonable must be ascertained judicially. But this is because the Legislature has no control over such a contract. So, too, in matters which do affect the public interest, and as to which legislative control may be exercised, if there are no statutory regulations upon the subject the courts must determine what is reasonable. The controlling fact is the power to regulate at all. If that exists, the right to establish the maximum of charge, as one of the means of regulation, is implied. In fact, the common-law rule, which requires the charge to be reasonable, is itself a regulation as to price. Without it the owner could make his rates at will, and compel the public to yield to his terms, or forego the use. * * * We know that this is a power which may be abused; but that is no argument against its existence. For protection against abuses by Legislatures, the people must resort to the polls, not to the courts."

In the case of *Leep* v. *Railway Co.*, 58 Ark. 407, 25 S. W. 75, the court recognized the power of the Legislature to regulate a business where same was clothed with a public interest, quoting with approval from the case of *Munn* v. *Illinois, supra,* and, as illustrative of the cases wherein such power was properly exercised, referred to the case of *Spring Valley Waterworks* v. *Schottler,* 110 U. S. 347, 4 S. Ct. 48, where it is said: "It is within the power of the government to regulate the price at which water should be sold by one who enjoys a virtual monopoly of the sale;" and to *Davis* v. *State,* 68 Ala. 58, 44 Am. Rep. 128, upholding an act making it unlawful for any person to transport, after sunset and before sun-

rise of the succeeding day, within certain counties, any cotton in the seed, except the owner might move from his field to his place of storage, because, as is said by the Alabama court, "its object was to regulate the traffic in the staple agricultural product of the State, so as to prevent a prevalent evil, which, in the opinion of the law-making power, may have done much to demoralize agricultural labor and to destroy the legitimate profits of agricultural pursuits, to the public detriment, at least in the territory affected;" and, the case of *Powell* v. *Pennsylvania*, 127 U. S. 678, 8 S. Ct. 992, holding that the Legislature of Pennsylvania had the power by statute to regulate or prohibit the sale or manufacture of oleomargarine.

. Not a great many years ago, the business of ginning cotton was purely a private business, the owners of many small farms having their own private gins, and, where the farms were too small to warrant this, each small neighborhood having its own community gin. The gins were operated by horses or mules; their construction was simple and their cost small, and at that time and under those conditions they were not the subject of State regulation. However, the ginning industry has completely changed, so that now the great modern ginneries gin many times the number of bales in a day that the old-fashioned horse gin could produce, and serve large territories and great numbers of people. Therefore many of the cotton growing States have found that this business has become affected with public interest, and have passed various regulatory statutes, which have been uniformly upheld as a valid exercise of legislative power.

In the case of *Simms* v. *State*, 80 Okla. 254, 196 Pac. 132, 23 A. L. R. 1475, the Supreme Court of Oklahoma sustained an act prescribing the retail price of bagging and ties to be charged by the operators of cotton gins. In the case of *Tisdale* v. *Scarborough*, 99 S. C. 377, 83 S. Ct. 594, the court said: "A general law with reference to the sale of cottonseed can be enacted." A num-

ber of other cases to the same effect are cited in the note to *Simms* v. *State, supra,* at pages 1478 *et seq,* 23 A. L. R.

In *Tallahassee, etc., Co.* v. *Holloway,* 200 Ala. 492, 76 So. 434, L. R. A. 1918A page 280, the Alabama Supreme Court, speaking of mills for the grinding of grain, said: "They have always been considered so necessary for the existence of the community that it was proper for government to foster or maintain them. And, in the absence of government aid, the individual proprietor, not pretending to serve the public, might maintain such mills as private mills, free from legislative interference, precisely as he might maintain a store, shop, or other private business; but when such proprietor makes his mill public and assumes to serve the public, then he dedicates his mill to public use, and it becomes a public mill, subject to public regulation and control. * * * Cotton gins were, of course, not so classed by the common law, for the reason that they are of comparatively modern invention, dating back no further than the year 1792. The question as to when private property becomes so clothed with a public interest and used in such a manner as to make it of public consequence was treated by the Supreme Court of the United States in *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 34 S. Ct. 612, (and other cases cited). * * * Any one has, of course, the right to erect a gin for his own private purposes, but, when he undertakes the ginning of cotton for the public, his gin is dedicated to the public use, and, under the authorities above cited, it becomes clothed with a public interest affecting the community at large and subject to governmental regulation.

Act No. 55 of the Acts of 1929 has declared the use of ice a public necessity, having direct relation to the health, comfort, safety and convenience of the public, and monopolistic in its nature, and the business of the manufacture, sale and distribution of ice is declared to be a public business. As we have seen, in order for a

business to be said to be clothed with a public interest, the use of its commodities by the public must be such as to make it of public consequence or be of such nature that the service rendered has become indispensable for the convenience and happiness of the people, and where it is fairly probable that excessive charges and arbitrary control of the business may arise. This is in effect the legislative declaration as to the business of the manufacture, sale and distribution of ice in the State of Arkansas. Is such a classification so unreasonable that no state of facts can be conceived that would sustain it? If it is of such nature, then it is the subject of judicial inquiry, and may and ought to be held invalid. We do not think, however, that such classification is unreasonable or arbitrary. It is a matter of common knowledge that the use of ice is universal in all the urban communities of this State; that it is both convenient and necessary for the comfort and wellbeing of a large proportion of our citizens; that the cost of machinery for the manufacture of ice and its installation is beyond the reach of the average citizen, and that in all of the smaller towns there is no competition, and the manufacture and sale of ice is conducted by a single manufacturer. These facts warrant the assumption on the part of the Legislature that the business is monopolistic in its nature.

The learned Chief Justice, in the case of *Munn* v. *Illinois, supra,* might well have been discussing the growth and character of the ice business in Arkansas and the necessity for its regulation when, after giving a history of the growth of the business then being considered by the court, he said: "This indicates very clearly that during the twenty years in which this peculiar business has been assuming its present immense proportions, something had occurred which led the whole body of the people to suppose that remedies such as are usually employed to prevent abuses by virtual monopolies might not be inappropriate here. For our purposes we must assume that, if a state of facts could exist that would justify

such legislation, it actually did exist when the statute now under consideration was passed.''

When the rules which have been stated by the cases cited *supra,* which determine what constitutes a business affected with a public interest, are applied to the ice business, it is manifest that a state of facts may well be conceived to exist which will clothe that business with a public interest. The Supreme Court of Oklahoma has so decided in the case of *Okla. Light & Power Co.* v. *Corp. Commission,* 96 Okla. 19, 220 Pac. 54, where it is said: ''In this situation the distributor of such a necessity as ice should not be permitted, by reason of the impracticability of any one else engaging in the same business, to charge unreasonable prices. * * * It may be contended that, if the manufacture, sale and distribution of ice is subject to regulation for the reason that the distributor happens to be the only one engaged in the business in a particular community, a mercantile establishment, which happens to be the only one in a community, would be subject to regulation for the same reason. The fallacy of such contention is apparent. Ice is an article of common household necessity, the supply of which must ordinarily be purchased every day. Ordinary articles of merchandise may be purchased at a convenient time and in sufficient supply for ordinary use for a considerable time.''

That the ice business is a business clothed with a public interest has also been held in the case of *Denton* v. *Denton Home Ice Co.,* 18 S. W. (Tex.) 606, 2d ed.; also in the case of *Tombstone* v. *Macia,* 30 Ariz. 218, 245 Pac. 677, 46 A. L. R. 828; and in *Saunders* v. *Arlington,* 147 Ga. 581, 94 S. E. 1022. As pointed out by appellees in their several briefs, there are cases taking the opposite view, notably those of Louisiana, Missouri and Wisconsin. However, the Louisiana decision, *Union Ice & Coal Co.* v. *Town of Ruston,* 135 La. 898, 66 So. 662, held that the construction and maintenance of a municipal ice plant by a small city operating municipal waterworks

and electric light systems could not be maintained by exercise of the taxing power, because of the peculiar language of the Louisiana State Constitution limiting the taxing power of municipal corporations under authority delegated by the General Assembly to businesses strictly public in their nature. The court holding that the word "strictly," as used in the Constitution, was used in the sense of undeviating, accurate, governed by exact rules. In the states of Wisconsin and Missouri, where it has been held the ice business is not public in its nature, the climatic conditions are vastly different from those of Arkansas, and the harvesting and storage of ice may be profitably pursued by individuals, and the necessity for the manufacture by artificial means does not exist as in this State.

We therefore conclude that the legislative declaration that the ice business is one properly the subject of governmental regulation is not arbitrary or unreasonable, and must be upheld by this court.

■ Having determined that §§ 15, 16 and 17 of the act under consideration are void as within the inhibition of the Constitution, and that it is within the power of Legislature to declare the sale and distribution of ice a business affected with a public interest, and as such the subject of proper legislative regulation, we have lastly to consider and determine whether the act is severable— that is, whether or not the act may stand with §§ 15, 16 and 17, *supra,* eliminated, or whether the remaining sections are so related to the unconstitutional ones that the whole act must fall.

By § 1 of act No. 65 of the Acts of 1929 the declaration is made that the use of ice is necessary, that the manufacture, sale and distribution of same is monopolistic in its nature, and subject to public regulation. Sections 2, 3 and 4 grant to the Railroad Commission jurisdiction over the ice business, empowering it to fix prices and rates for the sale, delivery and distribution, and to adopt such rules as might be necessary to carry

into effect the powers granted. Section 5 prohibits unjust discrimination, defines same, and fixes penalties for such. Section 6 provides for the printing and publishing of schedules of rates and charges. Section 7 defines the offenses for violation of the rules of the Commission fixing the prices for charges for distribution, for unjust discrimination, and for soliciting or accepting any discrimination. Section 8 requires those engaging in the manufacture, etc., of ice to file with the Commission a schedule of rates and charges for sale and delivery, with a statement giving information as to locality, capacity, persons in charge, etc., and provides for procedure for hearings regarding orders fixing rates. Section 9 provides for procedure for amending or changing regulatory orders. Section 10 and § 11 provide that rates fixed shall be deemed just until otherwise found by the Pulaski Circuit Court, and provides for appeals from orders of the Commission and procedure therefor. Section 12 authorizes the inspection of books and papers. Section 13 requires answers to questionnaires, and provides the penalty for failure to make same under oath within a specified time. Section 14 provides for license fees, etc. Section 16 has no relation to any portion of the act except the section immediately preceding (§ 15), which authorizes the Railroad Commission to deny permit to make or sell ice in a locality where it may determine the facility for those purposes already sufficient. Section 16 provides for the procedure for carrying into effect the provisions of § 15. Section 18 authorizes the Commission to adopt rules governing its proceedings, to regulate the manner of necessary investigations and hearings, and that same be public, and grants power to compel the attendance of witnesses and for production of books and papers, and to administer oaths. Section 19 empowers the Commission to employ assistants and regulate their salaries and all expenses to be paid out of funds derived from license fees, etc., and requires the Commission to make

an annual report of its proceeds, receipts and disbursements. Section 20 exempts those who make ice solely for their own use or for consumption by their employees. Section 21 repeals all laws in conflict. Section 22 provides that "if any section or part of this act shall be held to be invalid, it shall not affect the remaining portions thereof."

Even though the Legislature might not have expressed its will that valid parts of a statute should be preserved, though a part might be unconstitutional, it is the duty of the court to accomplish this purpose if, as stated in Cooley's Constitutional Limitations, 6 ed. p. 210, "a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid part."

The General Assembly of 1917 enacted a special statute creating an improvement district, and authorized the assessment of personal property, as well as real estate, to raise funds to provide for the construction and maintenance of the improvement, and provided that, if any part of the assessment should be declared to be void, then only that part of the property which it was legal to assess should be assessed to defray the cost of the improvement. In the case of *Snetzer* v. *Gregg*, 129 Ark. 542, 196 S. W. 925, the personal assessment was declared unconstitutional, and that the entire act was void except for the provision above, but held that, by reason of it, the act was severable, the court saying: "In R. C. L., § 123, is this statement: 'Occasionally the Legislature expressly states its will that the valid provisions of a statute shall be enforced in spite of any judicial determination that certain sections of the act are unconstitutional. Such expression of the will of the Legislature is generally carried out.' We are

not prepared to say that the rule stated by the text-writer can be given general application so as to apply to all cases where the lawmakers may see fit to incorporate such a declaration into a statute, but we do say, when applied to a statute like this, it constitutes a legislative declaration of its full purpose, and that declaration can and should be carried into effect.''

In *Sallee* v. *Dalton,* 138 Ark. 549-56, 213 S. W. 762, this statement is made: ''There is another reason why material parts, if not all, of this statute should be upheld, even if assailed portions were void. There is a section of the statute which reads as follows: 'If, for any reason, any provision of this act shall be held to be unconstitutional, it shall not affect the remainder of the act, but the act, in so far as it is not in conflict with the Constitution, shall be sufficient to stand.' ''

In the case of *Snetzer* v. *Gregg,* 129 Ark. 542, 196 S. W. 925, we passed on the question of partial invalidity of a statute, and held, ''that a provision similar to the one in the present case giving expression to the legislative will to put into effect every part of the statute found to be constitutional and valid, was effective to preserve intact parts of the statute found to be valid, even though other portions of the same statute were violative of the Constitution.''

In the case of *Nixon* v. *Allen,* 150 Ark. 244, 234 S. W. 45, the act before the court was an act, ''as shown by its title as well as the subject-matter of its various sections * * * a comprehensive and complete plan of government for the county of Pulaski. Section 28 of the act provided that, if any part should be held to be unconstitutional, that decision should not affect the validity of its remaining portions. The court held that § 1 of the act, which provided for two county judges for Pulaski County, was in conflict with § 28, article 7, of the Constitution, and that § 8, creating a board to fix the salaries of county officers and the salaries and numbers of their clerks, was a delegation of legislative authority, and void

under § 4, article 16, of the Constitution. After an examination of the remaining sections of the act, the court, after carefully reviewing and considering same as related to the section violative of the Constitution, concluded as follows: "A critical analysis of the various provisions of this act discloses that §§ 1 and 8 touch at some angle nearly all of the provisions of the act, except those embodied in the two last sections (the two last sections were § 28, noted *supra,* and § 29, providing the act to be supplemental to existing laws and not to repeal any except as are in conflict with the act). Sections 1 and 8 are to this act as is the hub to the wheel and the foundation pillars of a building. Since these two sections fall under the condemnation of the constitutional inhibition, they must be removed from the act, and thereby the whole fabric of the county government built up by the framers of this law necessarily falls to pieces."

Examining the act in the instant case in the light of the decisions of this court and applying to its construction the rules therein announced, we conclude that the act is not dependent upon §§ 15, 16 and 17, *supra.* They do not "touch at some angle nearly all the provisions of the act;" they are not "to this act as is the hub to a wheel and the foundation pillars of a building," but seek to accomplish a different purpose to the remainder of the act, and are neither necessary nor helpful for carrying it into effect. Without the invalid sections (15, 16 and 17) we have a comprehensive and workable plan for the regulation, sale, delivery and distribution of ice, and those sections are not indispensable or helpful in carrying this purpose into effect. The remaining sections of the act do not relate to and are not dependent upon the invalid sections. We are therefore of the opinion that the act is severable, especially with the aid of the expression of the legislative will that it should be so construed, and with such declaration it is manifest that the Legislature intended that the plan regarding the price and distribution of ice should stand, even though those

sections inserted, by which were given to the ice manufacturers a monopoly, should be unconstitutional.

It follows from what we have said that §§ 15, 16 and 17, *supra,* must be stricken from the act, and that the remainder of the act is a valid exercise of the legislative power and an expression of its will, and therefore must stand.

Inasmuch as the cases brought to this court on appeal were for the purpose of preventing the appellees from engaging in the ice business in Fort Smith and Jonesboro, Arkansas, the decree of the court in each case, in so far as it holds the act in question unconstitutional as to §§ 15, 16 and 17 and dismisses the complaint of the appellants for want of equity, is affirmed.