### SOUTHWEST UTILITY ICE CO. v. LIEBMANN.

### NEW STATE ICE CO. v. SAME.

Nos. 405, 406.

Circuit Court of Appeals, Tenth Circuit.

Aug. 20, 1931.

J. B. Dudley, of Oklahoma City, Okl., and Guy L. Andrews, of McAlester, Okl. (J. H. Everest and Phil D. Brewer, both of Oklahoma City, Okl., Andrews & Aston, of McAlester, Okl., and Rainey, Flynn, Green & Anderson and E. S. Ratliff, all of Oklahoma City, Okl., on the brief), for appellants.

Geo. M. Nicholson and Thos. H. Owen, both of Oklahoma City, Okl. (M. A. Looney, of Oklahoma City, Okl., on the brief), for appellee.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

These suits involve the constitutionality of chapter 147, Okla. Sess. Laws 1925, the provisions of which are set forth in marginal note.[1]

---

[1] "Section 1. That the manufacture, sale and distribution of ice within the State of Oklahoma is hereby declared to be a public business, as defined by Section 11032, of the Compiled Statutes of Oklahoma.

"Section 2. That no person, persons or corporation shall be permitted to manufacture, sell and distribute ice within the State of Oklahoma without first having secured a license for such purpose from the Corporation Commission of the State of Oklahoma. The license fee hereunder shall be the sum of fifty cents (50c) per ton, per annum, of the daily capacity of ice manufactured, sold, or delivered, but the minimum license shall be five dollars ($5.00).

"Section 3. That the Corporation Commission shall not issue license to any person, firm or cor-

The Southwest Utility Ice Company and the New State Ice Company, hereinafter called plaintiffs, are engaged in the manufacture, sale, and distribution of ice at Oklahoma City under licenses issued by the Corporation Commission pursuant to chapter 147, supra. The last license in the record expired June 30, 1930. Renewals of such licenses are neither pleaded nor proven. This alone would justify an affirmance of the decree below [42 F.(2d) 913], but, in view of the statement of plaintiffs' counsel at the oral argument that such licenses were in fact renewed, we proceed to a consideration of the merits.

If the statute is valid, a license issued thereunder is a property right in the nature of a franchise granted in consideration of the performance of a public service and is within the protection of the Fourteenth Amendment. Frost v. Corporation Commission of State of Oklahoma, 278 U. S. 515, 519, 520, 49 S. Ct. 235, 73 L. Ed. 483.

In February, 1930, Liebmann, hereinafter called defendant, commenced the construction of an ice manufacturing plant in Oklahoma City and was about to engage in the manufacture, sale, and distribution of ice in that city without first having obtained the license required by chapter 147, supra. Plaintiffs brought separate suits to enjoin defendant from so doing. The two suits were consolidated for trial.

These cases present the single question: Is the business of manufacturing and selling ice of such a character that it is subject to regulation to the extent of requiring a certificate of convenience and necessity before a person may engage in such business? Or, to put it another way, may the state prohibit one man from manufacturing ice on his own property and selling it to his neighbor at a price they mutually agree upon? The trial court answered these questions in the negative, and entered a decree dismissing the bills.

Prior to the enactment of chapter 147, supra; the Corporation Commission from time to time by order had regulated the price of ice, and its authority so to do had been upheld by the Supreme Court of Oklahoma in Oklahoma L. & P. Co. v. Corporation Commission, 96 Okl. 19, 220 P. 54. The Corporation Commission, under powers granted by prior statutes, had also made and enforced regulations governing the manufacture and sale of ice, to insure honest weights, pure and wholesome ice, and adequate delivery service. By chapter 147, supra, the Legislature undertook to grant the additional power to regulate by limiting the number of persons who might engage in the ice business in a given territory.

While there is no such thing as absolute freedom of the citizen to engage in a lawful

---

poration for the manufacture, sale and distribution of ice, or either of them, within this State, except upon a hearing had by said Commission at which said hearing, competent testimony and proof shall be presented showing the necessity for the manufacture, sale or distribution of ice, or either of them, at the point, community or place desired. If the facts proved at said hearing disclose that the facilities for the manufacture, sale and distribution of ice by some person, firm or corporation already licensed by said commission at said point, community or place, are sufficient to meet the public needs therein, the said Corporation Commission may refuse and deny the applicant (sic) for said license. In addition to said authority, the said Commission shall have the right to take into consideration the responsibility, reliability, qualifications and capacity of the person, firm or corporation applying for said license and of the person, firm or corporation already licensed in said place or community, as to afford all reasonable facilities, conveniences and services to the public and shall have the power and authority to require such facilities and services to be afforded the public; provided, that nothing herein shall operate to prevent the licensing of any person, firm or corporation now engaged in the manufacture, sale and distribution of ice, or either of them, in any town, city or community of this State, whose license shall be granted and issued by said Commission upon application of such person, firm or corporation and payment of license fee."

Section 4 provides the procedure for applying for a license and the hearing thereon.

"Section 5. That the Corporation Commission shall have the same power and authority to be charged with the duty of regulating and controlling the manufacture, sale and distribution of ice in all matters relating to the performance of public duties and the charges therefor, and correcting abuses and preventing unjust discrimination and extortion, as is exercised by said Commission as to transportation and transmission companies, and shall have the same power to fix rates, rules, charges and regulations to be observed by such person, firm or corporation engaging in the manufacture, sale and distribution of ice, or either of them, and the affording of all reasonable conveniences, facilities and service, as it may impose as to the transportation and transmission companies.

"Section 6. All and any orders made by said Commission fixing rates, charges, rules and regulations as to any person, firm or corporation engaged in the manufacture, sale and distribution of ice, or either of them, may be reviewed on appeal by the Supreme Court of the State of Oklahoma.

"Section 7. Any person, firm or corporation who shall engage in the business of manufacturing, selling and distributing ice or engage in either of said businesses, without first obtaining a license, provided for herein, shall be guilty of a misdemeanor and any such person shall be punishable by a fine not to exceed twenty-five dollars ($25.00), and each day's violation shall constitute a separate offense; provided, the Corporation Commission is hereby authorized to promulgate general orders not in conflict with this Act, and to enforce such orders against any person, firm or corporation manufacturing, selling or distributing ice or engaging in either of said businesses, by imposing a fine for the violation thereof not to exceed five hundred dollars for each of said violations.

"Section 8. Any person, persons or corporations aggrieved by any rate, or service, may file an application for a hearing under the terms and conditions of this Act."

Section 9 is a general repealing clause.

business, to make lawful use of his property, or to contract with respect thereto, and such rights are subject to a great variety of restraints, freedom in respect thereto is the general rule, and restraint thereof the exception; and the exercise of legislative authority to abridge such rights can be justified only by the existence of exceptional' circumstances. Adkins v. Children's Hospital, 261 U. S. 525, 546, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238; Ribnik v. McBride, 277 U. S. 350, 356, 48 S. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327.

In Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 116, 73 L. Ed. 287, 60 A. L. R. 596, the court said:

"It is settled by recent decisions of this court that a state Legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest.' * * * That phrase, however it may be characterized, has become the established test by which the legislative power to fix prices of commodities, use of property, or services, must be measured. As applied in particular instances, its meaning may be considered both from an affirmative and a negative point of view. Affirmatively, it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby in effect granted to the public. * * * Negatively, it does not mean that a business is affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance."

In Tyson & Bro. v. Banton, 273 U. S. 418, 47 S. Ct. 426, 428, 71 L. Ed. 718, 58 A. L. R. 1236, the court said:

"The authority to regulate the conduct of a business or to require a license, comes from a branch of the police power which may be quite distinct from the power to fix prices. The latter, ordinarily, does not exist in respect of merely private property or business, Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, 246, 22 S. Ct. 881, 46 L. Ed. 1144, but exists only where the business or the property involved has become 'affected with a public interest.' * * *

"A business is not affected with a public interest merely because it is large or because the public are warranted in having a feel-ing of concern in respect of its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease, or enjoyment from the existence or operation of the business; and, while the word has not always been limited narrowly as strictly denoting 'a right,' that synonym more nearly than any other expresses the sense in which it is to be understood.

"The characterizations in some decisions of businesses as 'quasi public' (People v. King; 110 N. Y. 418, 428, 18 N. E. 245, 1 L. R. A. 293, 6 Am. St. Rep. 389), 'not "strictly" private' (Aaron v. Ward, 203 N. Y. 351, 356, 96 N. E. 736, 38 L. R. A. [N. S.] 204), and the like, while well enough for the purpose for which they were employed, namely, as a basis for upholding police regulations in respect of the conduct of particular businesses, cannot be accepted as equivalents for the description 'affected with a public interest,' as that phrase is used in the decisions of this court as the basis for legislative regulation of prices. The latter power is not only a more definite and serious invasion of the rights of property and the freedom of contract, but its exercise cannot always be justified by circumstances which have been held to justify legislative regulation of the manner in which a business shall be carried on. * * *

"The significant requirement is that the property shall be devoted to a use in which the public has an interest, which simply means, * * * that it shall be devoted to 'a public use.' Stated in another form, a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby in effect granted to the public."

However, the fact that a business is "affected with a public interest" does not subject it to unlimited regulation. In Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 634, 67 L. Ed. 1103, 27 A. L. R. 1280, the court said:

"To say that a business is clothed with a public interest is not to determine what regulation may be permissible in view of the private rights of the owner. The extent to which an inn or a cab system may be regulated may differ widely from that allowable as to a railroad or other common carrier. It is not a matter of legislative discretion solely. It depends on the nature of the business,

on the feature which touches the public, and on the abuses reasonably to be feared. To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense of the owner. The extent to which regulation may reasonably go varies with different kinds of business. The regulation of rates to avoid monopoly is one thing. The regulation of wages is another. A business may be of such character that only the first is permissible, while another may involve such a possible danger of monopoly on the one hand, and such disaster from stoppage on the other, that both come within the public concern and power of regulation."

In Tyson & Bro. v. Banton, supra, the court further said:

"The right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, Case of the State Freight Tax, 15 Wall. 232, 278, 21 L. Ed. 146, and, as such, within the protection of the due process of law clauses of the Fifth and Fourteenth Amendments. See City of Carrollton v. Bazzette, 159 Ill. 284, 294, 42 N. E. 837, 31 L. R. A. 522. The power to regulate property, services, or business can be invoked only under special circumstances; and it does not follow that because the power may exist to regulate in some particulars it exists to regulate in others or in all."

A state may not, under the guise of protecting the public, arbitrarily prohibit a person from engaging in a lawful, private business, or impose unreasonable and unnecessary restrictions upon such a business. Burns Baking Co. v. Bryan, 264 U. S. 504, 513, 44 S. Ct. 412, 68 L. Ed. 813, 32 A. L. R. 661; Liggett Co. v. Baldridge, 278 U. S. 105, 113, 49 S. Ct. 57, 73 L. Ed. 204; Lawton v. Steele, 152 U. S. 133, 137, 14 S. Ct. 499, 38 L. Ed. 385; Meyer v. Nebraska, 262 U. S. 390, 399, 400, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446.

A declaration by the Legislature that a business is affected with a public interest is not conclusive. The matter is always open to judicial inquiry. Wolff Co. v. Court of Industrial Relations, supra, page 536 of 262 U. S., 43 S. Ct. 630; Tyson & Bro. v. Banton, supra, page 431 of 273 U. S., 47 S. Ct. 426.

The inquiry then is whether the manufacture and sale of ice is a business affected with a public interest to the extent required to justify the regulations sought to be imposed. This requires an examination into the nature of the business, the features thereof which touch the public, and the abuses reasonably to be feared. Wolff Co. v. Court of Industrial Relations, supra, page 539 of 262 U. S., 43 S. Ct. 630.

In Wolff Co. v. Court of Industrial Relations, supra, the court divides businesses, said to be "clothed with a public interest," into three classifications, as follows:

"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws by Parliament or colonial Legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs, and gristmills. State v. Edwards, 86 Me. 102, 29 A. 947, 25 L. R. A. 504, 41 Am. St. Rep. 528; Terminal Taxicab Co. v. Kutz, 241 U. S. 252, 254, 36 S. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765.

"(3) Businesses which, though not public at their inception, may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly."

The right to manufacture and sell ice is not a privilege in the nature of a franchise, such as the right to maintain a public wharf, or to operate a railroad or a street railway (26 C. J. p. 1011, § 4; 51 C. J. p. 411, § 8), but is a matter of common right open to all. Cap. F. Bourland Ice Co. v. Franklin Utilities Co., 180 Ark. 770, 22 S. W. (2d) 993, 68 A. L. R. 1018. Furthermore, it does not require a franchise to use the public streets.

It is clear that the ice business in its inception did not fall within either the first or second classification set forth in Wolff Co. v. Court of Industrial Relations, supra; Ice Co. v. Franklin Utilities Co., supra; State v. Orear, 277 Mo. 303, 210 S. W. 392,

396, 397. Therefore, we must determine whether there has come to exist in the manufacture and sale of ice peculiar conditions which have a definite relation to the public interest sufficient "to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use" and bring it within the third classification. Tyson & Bro. v. Banton, supra, pages 433, 438 of 273 U. S., 47 S. Ct. 426, 431; Ribnik v. McBride, supra, pages 355, 356 of 277 U. S., 48 S. Ct. 545.

In Wolff Co. v. Court of Industrial Relations, supra, the court further said:

"In nearly all the businesses included under the third head above, the thing which gave the public interest was the indispensable nature of the service and the exorbitant charges and arbitrary control to which the public might be subjected without regulation."

When rates or charges in a business are fixed by public regulation, competition is largely removed. Such rates must be sufficient to produce a fair return upon the value of the manufacturer's plant used and useful in the business. Permitting additional plants to enter the field in excess of the market requirements, unnecessarily increases rates to be fixed by the regulatory body and paid by the consumer. It is to prevent such needless duplication of plants and facilities, and the consequent increase in rates or charges, that certificates of public convenience and necessity are required. Idaho Power & Light Co. v. Blomquist, 26 Idaho, 222, 141 P. 1083, 1089, 1090, Ann. Cas. 1916E, 282.

█ The regulation of the price at which ice may be sold is an extraordinary interference with the liberty of the citizen (Near v. State of Minnesota, 283 U. S. 697, 51 S. Ct. 625, 75 L. Ed. 1357; Tyson & Bro. v. Banton, supra, page 431 of 273 U. S., 47 S. Ct. 426; Ribnik v. McBride, supra, page 356 of 277 U. S., 48 S. Ct. 545; Adkins v. Children's Hospital, supra, pages 546, 560, 561 of 261 U. S., 43 S. Ct. 394), and can only be justified by the existence of exceptional circumstances making it necessary for the protection of the public.

█ Notwithstanding the close relation between price regulation and the requirement of a certificate of convenience and necessity, we are of the opinion that a limitation on the right to engage in a business which is a matter of common right is an even greater encroachment on the rights of the citizen than the regulation of prices in such business. Hence, to justify such a limitation, there must exist stronger circumstances, making the regulation necessary in order to protect the public, than are required to warrant the fixing of rates or prices.

In 1929 Arkansas adopted a statute by which it undertook to empower the Railroad Commission to fix the price and regulate the delivery or distribution of manufactured ice, and to limit the number of persons who might engage in the manufacture, sale, or distribution of ice in a given territory. See Act No. 55, p. 110, General Assembly of Arkansas 1929. The validity of this statute came before the Supreme Court of that state in Ice Co. v. Franklin Utilities Co. supra. The court sustained the provisions of the law empowering the Railroad Commission to fix the price of ice, but held the provisions authorizing that commission to limit the number of persons who might engage in the manufacture and distribution of ice in a given territory to be an undue interference with the common or natural right of the citizens to engage in such business, not necessary for the protection of the public interests, and in violation of the provisions of the Arkansas Constitution prohibiting the creation of a monopoly and of the Fourteenth Amendment to the Federal Constitution.

█ Ice is now generally used for the conservation and preservation of foodstuffs and in the treatment of the sick, and is recognized as a necessary and indispensable commodity. However, it is no more essential than are meat, bread, clothing, or coal, and "it has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator, or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by state regulation," and "one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances." Wolff Co. v. Court of Industrial Relations, supra, page 537 of 262 U. S., 43 S. Ct. 630, 633. Therefore, it becomes pertinent to inquire whether there is sufficient actual or potential competition in the sale and distribution of ice to protect the public from arbitrary treatment and exorbitant prices. Home ice manufacturing plants are now available to persons of average means. Many hospitals, restaurants, meat markets, hotels and dairies have their own ice manufacturing and refrigerating

plants. Ice may be shipped by rail in refrigerator cars a distance of 100 miles at an approximate cost of ten cents per hundred. It may be transported in insulated trucks over improved highways a distance of 75 miles and sold in competition with local ice manufacturers. Ice manufacturers in Oklahoma in 1925 operated 378 rural routes extending 25 to 30 miles from their plants through sparsely settled territory, and delivered ice to consumers on farms and in small communities. In 1930 such routes had been increased to 769. Therefore, while one ice plant can supply the ice needs of an ordinary city, and most of the smaller cities have only one ice plant, if an ice manufacturer in a town having only one plant should demand excessive prices, manufacturers in nearby towns, in the absence of monopolistic trade agreements, would normally compete by shipping in ice by rail or trucks.

Counsel for plaintiffs assert that a carload of ice will weigh approximately eighteen tons; that a small community will consume only about one and a half tons per day, and that it is therefore impractical to ship ice to such a community in carload lots because of the loss from shrinkage and the carrying expense. Of course this is true, but such a community could not support a small commercial ice plant and would have to be served through truck transportation from ice plants in larger cities.

■ Counsel for plaintiffs further assert that since the adoption of chapter 147, supra, the quality of ice has improved, honest weights have been given, regular deliveries have been maintained, and the amount of ice used has greatly increased. While only two states, Oklahoma and Arkansas, have enacted statutes to fix prices and limit the number of persons who may engage in the ice business, we know as a matter of common knowledge that such improvements have taken place in other states. Therefore, they are not attributable to, and may be accomplished without, such regulations. To a large extent, they may be ascribed to the efforts of the National Association of Ice Industries. Eighty-four per cent. of the ice produced in the United States is manufactured by members of that association. People have learned the value of ice for the conservation and preservation of food and health. They are buying and using it in increasing quantities. Ice plants in the United States increased from 2,700 in 1914 to 6,200 in 1929. The annual per capita consumption of ice in the United States increased from 712 pounds in 1919 to 1,157 pounds in 1929. Business and home refrigeration plants have produced competition. Scoring machines by which ice is cut into uniform oversized blocks to compensate for loss from shrinkage came into use about 1925. Resulting improvements in the quality of ice and in service have naturally followed.

Neither has the Oklahoma law resulted in lowering of the price to the consumer. On the contrary, the price of ice in that state, if allowance is made for the decrease in the cost of manufacture, has increased. Furthermore, the cost of ice in Oklahoma compares unfavorably with the cost of ice in other Southern States. The prices of ice during the year 1928, three years after the adoption of the Oklahoma statute, in eleven Southern States, as shown by the last edition of the Ice Blue Book (a standard authority) published in 1928, are as follows:

| | Domestic Trade (100 lbs.) | Light Commercial (100 lbs.) | Heavy Commercial Ton | Dealers Ton | Carload Ton | Car Icing Ton |
|---|---|---|---|---|---|---|
| Alabama | 58.5c | 43.4c | $7.55 | $7.00 | $4.75 | $6.18 |
| Arkansas | 59.2c | 46.7c | 7.92 | 6.89 | 4.83 | 6.00 |
| Florida | 61.0c | 40.5c | 6.67 | 6.73 | 4.22 | 5.96 |
| Georgia | 62.5c | 48.0c | 7.72 | 5.75 | 4.25 | 5.75 |
| Louisiana | 53.0c | 42.0c | 7.03 | 5.50 | 4.50 | 5.87 |
| Mississippi | 63.3c | 48.8c | 8.14 | 6.88 | 5.00 | 6.82 |
| N. Carolina | 60.5c | 42.0c | 7.25 | 4.56 | 3.83 | 5.46 |
| Oklahoma | 70.0c | 50.0c | 8.60 | 6.96 | 5.90 | 7.70 |
| S. Carolina | 62.0c | 48.5c | 8.20 | 6.50 | 5.00 | 7.50 |
| Tennessee | 54.0c | 44.5c | 7.40 | 5.33 | 3.80 | 6.15 |
| Texas | 64.0c | 42.0c | 6.10 | 6.00 | 4.58 | 6.57 |
| Average | 60.7c | 45.1c | 7.50 | 6.19 | 4.60 | 6.36 |

■ It is our conclusion that, while ice is an essential commodity, there is both potential and actual competition in such business sufficient to afford adequate protection to the public from arbitrary treatment and excessive prices. With such competition existing in the business, we seriously doubt that the manufacture of ice is so affected with a public interest as to justify the fixing of prices at which the commodity shall be sold, and we hold that it is not so affected to the extent required to warrant the more serious invasion of the rights of the citizens by limiting the number of persons who may engage in such business in a given territory.

The decree is affirmed with costs.